794 A.2d 848 (2002)
350 N.J. Super. 195
Michael DePALMA and Donna DePalma, Plaintiff-Respondents/Cross-Appellants,
v.
BUILDING INSPECTION UNDERWRITERS, Defendant-Appellant/Cross-Respondent, and
Paul Carrafa, Russell McLaughlin, Sr., Defendants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 2001.
Decided April 15, 2002.
*851 Gerard W. Quinn, argued the cause for appellant/cross-respondent (Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, Atlantic City, and Joseph S. Berarducci, Stratford, attorneys; Mr. Quinn and Mr. Berarducci, on the brief).
Clifford L. Van Syoc, Cherry Hill, argued the cause for respondents/cross-appellants.
Before Judges KING, WECKER and WINKELSTEIN. *849
*850 The opinion of the court was delivered by WECKER, J.A.D.
This appeal requires us to determine the applicable limit on punitive damages awarded for a violation of the Family Leave Act, N.J.S.A. 34:11B-1 to -16 (the Act). Defendant Building Inspection Underwriters (BIU) appeals from a judgment entered after a jury verdict for plaintiff Michael DePalma. Plaintiff cross-appeals from that portion of the final judgment that reduced the jury's $400,000 punitive damages award to $10,000, the maximum allowed under the Family Leave Act, N.J.S.A. 34:11B-11.
*852 In affirming the judgment in its entirety, we hold that the proofs and burdens applicable to an action brought under the Family Leave Act follow the pattern applicable to a claim under the Law Against Discrimination; there was no error or abuse of discretion in excluding defendant's proffered expert on administrative regulations applicable to plaintiff's employment as a plumbing inspector for an on-site inspection agency licensed under the Uniform Construction Code; the credible evidence was sufficient to sustain the jury's verdict; the punitive damages award is governed by the $10,000 limit set forth in the Family Leave Act and not the higher limit of the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17; and the award of counsel fees based on the "lodestar" was a reasonable exercise of judicial discretion.
Here is the procedural history. Plaintiffs Michael DePalma and Donna DePalma[1] filed a complaint against BIU in May 1997, alleging that BIU fired Michael DePalma because he had taken twenty-one days off and then sought additional leave to care for his severely injured son, and that his firing violated the Family Leave Act.[2] Plaintiff sought compensatory and punitive damages and attorneys' fees.
After a trial in Camden County before Judge Snyder and a jury in May 1999, the jury found that BIU had terminated plaintiff in violation of the Family Leave Act and awarded plaintiff $40,000 in economic damages and $100,000 in non-economic damages. The jury also awarded $400,000 in punitive damages. The judge granted plaintiff fourteen days to file an application for counsel fees. On May 20, 1999, the judge signed a partial judgment, awarding plaintiff $140,000 in compensatory damages, $15,359.30 in prejudgment interest, and $400,000 in punitive damages.
After raising the issue sua sponte and giving counsel an opportunity to brief the issue, the judge concluded at a hearing on July 9, 1999 that the Family Leave Act limited plaintiff's punitive damages to $10,000 and molded that portion of the jury verdict accordingly. The judge also denied BIU's motion for a new trial or for judgment notwithstanding the verdict.
On August 9, 1999, Judge Snyder issued an order memorializing his decisions denying BIU's motion for a new trial, judgment notwithstanding the verdict, or remittitur; denied plaintiff's motion to restore the $400,000 punitive damages award; and permitted plaintiff to submit a fee application within thirty days.
BIU filed its notice of appeal from the partial judgment on August 25, 1999. On October 21, 1999, we denied plaintiff's request to dismiss the appeal as interlocutory and instead remanded the matter to the trial court to decide plaintiff's fee request within forty-five days. Plaintiff's fee application was submitted on the forty-fifth day, and on December 21, 1999, Judge Snyder issued his final judgment, awarding plaintiff $68,848.25 in counsel fees and $948.16 in litigation costs. Judgment was entered in the total amount of $235,155.71, representing $140,000 compensatory damages, $15,359.30 pre-judgment *853 interest, $10,000 punitive damages, plus counsel fees and costs.
Judge Snyder rejected BIU's motion for reconsideration of the fee award, and BIU thereafter filed an amended notice of appeal respecting that award. Plaintiff filed a notice of cross-appeal on January 13, 2000.
A brief description of the nature of BIU's business is essential background to this case. The Uniform Construction Code (the Code) adopted by the Department of Community Affairs (DCA) includes requirements to be met before newly constructed housing can be occupied. Separate sub-codes govern requirements in the areas of building, plumbing, electrical and fire. Newly constructed housing requires a certificate of occupancy (CO), which in turn requires that a licensed sub-code inspector must inspect and certify that the construction meets the requirements of each sub-code. See generally N.J.A.C. 5:23-2.16 to -4.15.
BIU is an independent "on-site inspection and plan review agency" approved to perform code inspections for municipalities which do not employ their own licensed municipal inspectors. BIU's inspectors thus perform the roles of sub-code officials for those municipalities. See N.J.S.A. 52:27D-124. Cherry Hill was one of the municipalities with which BIU had a contract to perform such services.
Paul Carrafa was BIU's first employee. He began in April 1987 and left BIU in September 1997, having been its president since 1994 or 1995. Michael Schaffer was BIU's New Jersey "state manager," who oversaw BIU's inspections process in New Jersey and supervised BIU's licensed code inspectors, including DePalma.
The jury heard the following evidence. From 1974 through 1990, DePalma operated his own private plumbing business, engaging primarily in residential work. He was licensed as a plumbing inspector and sub-code official in New Jersey and therefore could perform inspections under the plumbing sub-code.
DePalma was first hired by BIU in 1990 as a plumbing sub-code inspector. When he was hired, he told Carrafa that he worked for Sears part-time as a plumber and also did some private plumbing work; Carrafa expressed no concern about DePalma's outside work. DePalma thereafter worked in BIU's Cherry Hill office, and Carrafa considered him a good inspector.
In June 1992, DePalma voluntarily left his job at BIU and moved with his wife to Florida. In late 1993, he decided to return to New Jersey, and Carrafa rehired him. DePalma returned to his position with BIU in January 1994, acting as the plumbing code inspector for Cherry Hill at an annual salary of $38,000. According to him, during the next two years everything went well on the job. He continued to do some minor plumbing work on the side, did not hide this work from his supervisors, and was never told he could not do outside work. He testified that he did not work for Sears during this period; he rejoined Sears only after BIU terminated his employment in 1996.
DePalma testified that his outside plumbing work after January 1994 consisted of small jobs for friends, which did not interfere with his duties at BIU, did not require permits or inspection under the Code, and did not violate any applicable regulations.[3]
*854 DePalma occasionally was asked to attend night-time municipal meetings in Berlin, New Jersey on BIU's behalf. He was told that either he would be compensated for the extra hours he spent in Berlin, or he would be allowed to work fewer hours on other duties. According to Carrafa, DePalma attended a few such meetings, after which he decided that attending the meetings was not part of his duties. DePalma testified that he never complained about working in Berlin, but conceded that he was unable for various reasons to attend all of the Berlin meetings to which he was initially assigned.
At some point during his second period of employment with BIU, DePalma decided to start a business of his own, Building Code Enforcement, Inc. (BCE), with a friend and partner, Ed O'Neill. DePalma testified that he did not believe owning and working with BCE would conflict with his duties at BIU because the new business was to perform home inspections only for resale properties, which would not require licensed inspections and would not compete with BIU's business. DePalma claimed that he told Carrafa about this proposed venture, and Carrafa approved it. According to both DePalma and O'Neill, O'Neill retained an attorney to prepare a certificate of incorporation for BCE and took the necessary steps to incorporate the business. BCE was incorporated in November 1995. According to both O'Neill and DePalma, although DePalma was named a director, vice president and secretary/treasurer, he had no input into the preparation of the incorporation papers, and he was not aware of their contents until trial.
BCE's certificate of incorporation filed November 9, 1995 was inconsistent with DePalma's and O'Neill's testimony, in that the stated purpose of the corporation included Code inspections for new construction.[4] The certificate made no reference to inspections for resales. DePalma conceded that performing Code inspections would be in direct competition with BIU's business, and that such competing activity would have warranted his termination from BIU. DePalma also admitted that BCE ultimately filed an application to become a licensed on-site agency, but did so only after he was fired. At that point he intended to compete with BIU.[5] O'Neill confirmed that the license application was filed after DePalma was fired. The license was issued effective June 1, 1996.
DePalma disputed Carrafa's claim that while employed at BIU, he tried to recruit Schaffer and other BIU employees to work for BCE; he claimed that BCE had no need for licensed inspectors at that time. Rather, DePalma pointed out that Schaffer himself did home resale inspections for another company, Accuspek, even while he *855 was employed at BIU. Schaffer confirmed this fact.
On March 5, 1996, DePalma's twenty-seven-year-old son Michael was seriously injured in a car accident in Florida. DePalma and his wife immediately went to their son's hospital bedside. Before DePalma left, Schaffer told him to go to Florida and do what had to be done to take care of his son. DePalma remained in Florida with his son and his wife until March 18, when he returned to New Jersey.
Two days later, plaintiff was informed that Michael had taken a turn for the worse. He immediately returned to Florida, with BIU's permission, and remained there until Michael was discharged from the hospital on April 4. DePalma returned to work on Monday, April 8, while his wife again remained behind in Florida with their son. Up to that point, DePalma had been in Florida, away from his job at BIU, for a total of twenty-one work days. He used accumulated sick and vacation time and continued to be paid and receive all benefits during his absence.
On Wednesday, April 10, DePalma and Schaffer had lunch. According to DePalma, he asked Schaffer about his job status with BIU and was assured that it was fine. DePalma then asked Schaffer if he could take some four-day weekends so that he could spend time with his wife and son in Florida. According to DePalma, Schaffer responded that there was no problem, and he should do whatever was necessary. Further according to DePalma, Schaffer also assured him that he had a job with BIU for as long as he wanted one.
Although Schaffer confirmed at trial that he approved DePalma's request to take four-day weekends, he denied telling him that his job status was fine, or that he had a job with BIU for as long as he wanted one. According to Schaffer, he promptly told Carrafa about DePalma's request for long weekends, and Carrafa approved. Nevertheless, on Thursday, April 11, Carrafa told Schaffer to terminate DePalma. Schaffer called DePalma the following night, Friday, April 12, informed him of Carrafa's decision, and told him that he did not know why he was being terminated. DePalma testified that he was crushed. As a result of his termination, he lost not only his salary, but also his health benefits, his 401K and profit-sharing contributions from BIU, and the use of a company vehicle.
DePalma immediately resumed his plumbing job with Sears. He also worked as a part-time municipal plumbing inspector for three different townships for six or seven months, thirty to thirty-three hours weekly. Beginning in January 1997, he began full-time work as a plumbing and building inspector for three townships. His salaries in those positions totaled approximately $54,000, which exceeded his final salary at BIU. Thus the jury was instructed that any back pay award would end at that point.
DePalma claimed that he attempted to learn why he was terminated by BIU. He called Schaffer, as well as Bonnie Risi, the company's Financial Director, and was told that only Carrafa could tell him why he was fired. But Carrafa would not return his calls. DePalma's oral and written requests to BIU to see his personnel file were denied. Risi confirmed that she received DePalma's requests, but that Carrafa instructed her not to supply the personnel file without a subpoena. When DePalma finally spoke with Carrafa, Carrafa refused to explain why he had been fired.
Not surprisingly, the evidence concerning BIU's actual reasons for firing DePalma was hotly disputed. DePalma believed *856 he was fired because he asked for leave after his twenty-one day absence so that he could take long weekends to travel to Florida to be with his wife and son.[6] According to Carrafa, who took full responsibility for the decision, DePalma was fired for legitimate reasons unrelated either to his previous twenty-one days off or his request for extended weekends. Carrafa claimed that he had decided back in January or February to fire DePalma, well before his son was injured in March.
Carrafa admitted that he did not tell DePalma why he was fired but claimed it was because DePalma only heard what he wanted to hear and would not have agreed with Carrafa's reasons; thus there was no point in telling him those reasons. Carrafa also testified that he waited until April because the Cherry Hill office was busy and hiring a replacement would take time. Carrafa told no other BIU employees of his termination decision because he knew the other inspectors would spread the word, thereby jeopardizing DePalma's ability to obtain another job once he was fired. Then Carrafa had to wait until DePalma returned from Florida. Once he returned, Carrafa fired him out of fear that he would create "havoc" if he continued to work at BIU. Carrafa admitted that nothing in DePalma's personnel record documented that he had decided in the first two months of 1996 to terminate DePalma's employment.
Carrafa claimed several legitimate reasons for deciding to fire DePalma, each of which DePalma challenged. First, Carrafa claimed that DePalma constantly asked for raises, often in inappropriate circumstances. DePalma claimed that he sought raises from BIU on only two occasions, and did so privately to Carrafa.
Second, Carrafa claimed that DePalma's outside work as a plumbing subcontractor violated the Code, thereby jeopardizing BIU's license as an on-site agency. Carrafa apparently relied upon N.J.A.C. 5:23-4.14(f), which provides that
[e]xcept as otherwise provided in this subsection, no person employed by or associated with an on-site inspection agency as an employee, proprietor, officer, director, partner or manager shall engage in, or otherwise be connected directly or indirectly, for purposes of economic gain with, any business or employment furnishing labor, materials, products or services for the construction, alteration or demolition of buildings within the State. Nor shall any such proprietor, officer, director, partner, manager or employee engage in any other work that conflicts with his or her or the agency's official duties.
Carrafa believed that DePalma was working for Sears during his second tenure with BIU, as well as doing other outside plumbing work, and concluded that such outside work was in violation of the above-cited conflict-of-interest regulation. However, Carrafa never informed or warned DePalma of the perceived violation.
DePalma denied that his outside work violated any conflict-of-interest regulation. First, as noted above, he denied being employed by Sears during his second tenure at BIU. Second, all of his outside work constituted "minor jobs" for friends, as that phrase is defined at N.J.A.C. 5:23-1.4. Thus, DePalma claimed to be exempt from the conflict-of-interest provision of N.J.A.C. 5:23-4.14(f) by virtue of *857 N.J.A.C. 5:23-4.14(f)(2)(iii), which provides that Section 4.14(f) does not apply to "employment which is not subject to the regulations." Because minor work was not regulated under the Code, DePalma believed his outside work was not governed by Section 4.14(f).
Third, DePalma claimed that his outside work actually was governed not by N.J.A.C. 5:23-4.14, but by N.J.A.C. 5:23-4.5, and that N.J.A.C. 5:23-4.5(j)(2) provides that
[n]o person employed by an enforcing agency as a construction or subcode official, assistant to the construction or subcode official, trainee, inspector or plan reviewer, shall engage in, or otherwise be connected directly or indirectly for purposes of economic gain, with any business or employment furnishing labor, materials, products or services for the construction, alteration, or demolition of buildings or structures within any municipality in which he is so employed by an enforcing agency, and in any municipality adjacent to the municipality in which he is thus employed.

[Emphasis added.]
DePalma did no outside work in Cherry Hill, the township in which he worked, or in any adjacent municipality. Thus he believed that he was not in violation of the regulations.
Carrafa's third claimed reason for firing DePalma was that he constantly complained about his workload, in particular his nighttime duties in Berlin. Carrafa did not appreciate an employee telling him where he would work. Schaffer confirmed that DePalma refused to work in Berlin at night.
Finally, and most importantly according to Carrafa, he believed DePalma was recruiting BIU employees to join his newly formed, competing business. Carrafa testified that DePalma approached at least three BIU employees, Schaffer, Jay Dilworth, and Art Jacobs for that purpose. Schaffer testified that DePalma asked him to be the fire sub-code official for BCE. Jacobs testified that although DePalma did complain to him about his pay, and was doing outside work that Jacobs believed to be in violation of Code regulations, DePalma did not try to recruit him to BCE.
Obviously, there was conflicting evidence before the jury respecting BIU's true reasons for terminating DePalma's employment. Based on all of the evidence, the jury found that DePalma was wrongfully terminated by BIU in violation of the Family Leave Act and awarded economic damages of $40,000 and non-economic damages of $100,000. The jury also found that DePalma was entitled to punitive damages, and after a brief hearing on the punitive damages issue, bifurcated in accordance with Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 627 A.2d 1081 (1993), the jury awarded $400,000 in punitive damages. Judge Snyder thereafter concluded that punitive damages were capped at $10,000 by the Family Leave Act and molded the verdict accordingly.
On appeal, BIU argues that the jury's verdict was against the weight of the evidence; that the trial judge erred in rejecting its requested jury instruction concerning the Code regulation applicable to DePalma's outside work; that the judge erred in awarding him any counsel fee; that the fee award in any event was excessive; and that the jury's damage award was so excessive as to "demonstrate prejudice, sympathy, partiality, or passion" requiring a new trial. On his cross-appeal, DePalma argues that the judge erred in limiting his punitive damages to the Family Leave Act's $10,000 cap in light of the subsequently enacted Punitive Damages Act. We have carefully considered the record, the briefs, and the *858 arguments of counsel and conclude that neither legal error nor any mistaken exercise of judicial discretion warrants our intervention on defendant's appeal or plaintiff's cross-appeal, and that sufficient credible evidence supports the jury's verdict as molded by the trial judge.

I.
In order to consider defendant's arguments respecting the weight of the evidence, we begin by examining the New Jersey Family Leave Act. The Act, adopted in 1989, "represents the culmination of a comprehensive legislative effort to maintain the integrity of the family unit and promote flexibility and productivity in the work place." D'Alia v. Allied-Signal Corp., 260 N.J.Super. 1, 6, 614 A.2d 1355 (App.Div.1992). The stated purpose of the legislation is to avoid the necessity for individuals "to choose between job security and parenting or providing care for ill family members." N.J.S.A. 34:11B-2. The Legislature expressly found it necessary "to promote the economic security of families by guaranteeing jobs to wage earners who choose to take a period of leave upon the birth ... of a child or serious health condition of a family member." Ibid.
The Act established the right of an employee "to take a period of leave ... without risk of termination of employment or retaliation by employers and without loss of certain benefits." Ibid. Specifically, the Act provides in relevant part that an employee with an adult child who has a "serious health condition," see N.J.S.A. 34:11B-3a(2) and l, may take family leave for up to twelve weeks in any twenty-four month period. N.J.S.A. 34:11B-3i; N.J.S.A. 34:11B-4.[7] Such leave may be taken "intermittently," N.J.S.A. 34:11B-4a, on a "reduced leave" schedule, so long as the employee provides reasonable notice under the circumstances and avoids undue disruption of the employer's operations. N.J.S.A. 34:11B-5. The Sponsors' Statement to Senate 2035 expressly referred to the fact that "family leave need not be taken consecutively." The Act provides job security by requiring that the employee be "restored ... to the position held... when the leave commenced or to an equivalent position of like seniority, status, employment benefits, pay, and other terms and conditions of employment." N.J.S.A. 34:11B-7. Leave may be denied under limited circumstances not claimed here. See N.J.S.A. 34:11B-4h. In addition to providing for assessment of a civil penalty not to exceed $2,000 for a first violation or $5,000 for each subsequent offense, N.J.S.A. 34:11B-10, the Act provides that an aggrieved employee may sue for compensatory and limited punitive damages, as well as attorneys' fees. N.J.S.A. 34:11B-11 and -12.
We are satisfied that the necessary elements and proofs of a wrongful discharge claim under the Family Leave Act, like wrongful discharge claims under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -9, or the New Jersey Constitution, must follow the pattern applicable to claims under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. See, e.g., Abbamont v. Piscataway Tp. Bd. of Educ., 138 N.J. 405, 418, 650 A.2d 958 (1994) (alleging CEPA violation); Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 389 A.2d 465 (1978) (alleging violation of State constitutional guarantee of equal protection and clearly enunciated *859 public policy against discrimination based upon gender); Kolb v. Burns, 320 N.J.Super. 467, 477, 727 A.2d 525 (App. Div.1999) (CEPA). The elements of a cause of action under the Family Leave Act therefore are: (1) plaintiff was employed by defendant; (2) plaintiff was performing satisfactorily; (3) a qualifying member of plaintiff's family was seriously injured; (4) plaintiff took or sought to take leave from his employment to care for his injured relative; and (5) plaintiff suffered an adverse employment action as a result.
Our cases under LAD have adopted the McDonnell Douglas[8] framework for proving unlawful discrimination by indirect, circumstantial evidence. The sufficiency of the proofs and the applicable burdens in LAD and CEPA cases generally follow case law under Title VII, 42 U.S.C.A. § 2000e-2. E.g., Mogull v. C.B. Commercial Real Estate Group, Inc., 162 N.J. 449, 461-62, 744 A.2d 1186 (2000); Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550, 569 A.2d 793 (1990); Kolb, 320 N.J.Super. at 478-79, 727 A.2d 525; see also Bowles v. City of Camden, 993 F.Supp. 255 (D.N.J.1998). The plaintiff must first present a prima facie case by producing some credible evidence of each element of the cause of action. The burden of producing evidence then shifts to the defendant to show that there was a legitimate reason for the termination. Mogull, 162 N.J. at 461-62, 744 A.2d 1186; Bergen Commercial Bank v. Sisler, 157 N.J. 188, 209, 723 A.2d 944 (1999). Once such evidence is produced, the plaintiff has an opportunity to establish that the proffered reason was pretextual, thereby enabling the employee to "prove an employer's [unlawful] intent through circumstantial evidence." Sisler, 157 N.J. at 209, 723 A.2d 944. The plaintiff nevertheless retains the burden of proving that the wrongful motive was a substantial or determinative factor in the discharge decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 419 (1993); Sisler, 157 N.J. at 211, 723 A.2d 944; Erickson, 117 N.J. at 550, 569 A.2d 793. A plaintiff can do so by direct or circumstantial evidence. See Patterson v. McLean Credit Union, 491 U.S. 164, 187-88, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132, 157-58 (1989); Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 433, 667 A.2d 355 (App.Div.1995); see also Leahey v. Singer Sewing Co., 302 N.J.Super. 68, 74-79, 694 A.2d 609 (Law Div.1996) (citing Marzano v. Computer Sci. Corp., Inc., 91 F.3d 497 (3d Cir.1996) for use of the McDonnell Douglas approach to a pretext case in the context of the New Jersey Family Leave Act.)
A common form of circumstantial evidence is evidence tending to show that the defendant's proffered reasons are pretextual. See Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir.1997); Greenberg v. Camden County Vocational & Technical Schools, 310 N.J.Super. 189, 200, 708 A.2d 460 (App.Div.1998); Romano v. Brown & Williamson Tobacco Corp., 284 N.J.Super. 543, 551, 665 A.2d 1139 (App.Div.1995); Kelly, 285 N.J.Super. at 431-32, 667 A.2d 355; see also Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994). Such evidence, alone or together with other circumstantial evidence, can meet the plaintiff's burden of proof. See Sisler, 157 N.J. at 211, 723 A.2d 944.
There is no question that DePalma presented a prima facie case: that he was fired for taking time off and for requesting *860 additional intermittent leave to care for his injured son. There is equally no question that BIU presented evidence of legitimate reasons for terminating DePalma's employment: primarily that he was competing with BIU for work and for employees, and that he was engaged in outside work in violation of a conflict-of-interest regulation that exposed BIU to loss of certification. The case before the jury boiled down to whether BIU's proffered reasons for DePalma's termination were the real reasons or whether they were pretextual.
This was a classic credibility case for the jury. Both parties were vulnerable on issues of credibility. DePalma's testimony regarding his outside employment and his newly formed corporation was not without question. Nevertheless, Carrafa's credibility was compromised by several circumstances: the lack of evidence to support his contention that he had decided to terminate DePalma before his son's accident, the timing of the termination immediately after DePalma's request for additional leave, and Carrafa's refusal to give DePalma any reason for his termination until DePalma filed suit. The jury obviously resolved those credibility questions in favor of DePalma and against BIU. The trial judge could not say that the evidence, circumstantial though it may have been, was insufficient to support the jury's conclusions; neither can we.
The standard of appellate review of a motion for a new trial is set forth at R. 2:10-1: "The trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." That standard reflects R. 4:49-1(a), which directs that "[t]he trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." See Dolson v. Anastasia, 55 N.J. 2, 6-8, 258 A.2d 706 (1969); see also Pressler, Current New Jersey Court Rules, comment 1 on R. 4:49-1; comment 2.2 on R. 2:10-1. Our review of the record does not suggest a miscarriage of justice.

II.
We next consider BIU's contention that the judge erred in barring testimony from its proffered "expert" on the applicable conflict-of-interest regulations and in refusing to instruct the jury respecting the administrative regulation governing DePalma's outside employment.
At trial, BIU proposed to call a former official of the Department of Community Affairs as an expert on regulations under the Code, representing that he would testify that DePalma's outside business activities were governed by and were in violation of N.J.A.C. 5:23-4.14(f), which prohibits any employee of an on-site inspection agency from engaging in any remunerated construction or alteration services "within the State." BIU had not named the witness or provided his report during the discovery period, and its belated attempt to call a witness to offer a legal opinion, and to introduce records of other private employees cited for violations, came as a surprise during the trial. The trial judge properly excluded the testimony on that ground, and his ruling constituted a reasonable exercise of discretion, consistent with Wymbs ex rel. Wymbs v. Tp. of Wayne, 163 N.J. 523, 535-37, 750 A.2d 751 (2000), and Westphal v. Guarino, 163 N.J.Super. 139, 145-46, 394 A.2d 377 (App. Div.1978), aff'd o.b., 78 N.J. 308, 394 A.2d 354 (1978); see also Thomas v. Toys "R" Us, Inc., 282 N.J.Super. 569, 581-82, 660 A.2d 1236 (App.Div.), certif. denied, 142 N.J. 574, 667 A.2d 191 (1995).
*861 The judge also rejected BIU's request that he instruct the jury that N.J.A.C. 5:23-4.14(f) applied to and prohibited DePalma's outside work, and that his work was not governed by N.J.A.C. 5:23-4.5(j)2, which arguably applies only to municipal employees and prohibits outside employment within the same or any adjoining municipality (but not the entire state). The judge understandably found the regulations unclear respecting DePalma's outside work. In any case, no such instruction was relevant to the jury's task. The issue before the jury was not a legal questionwhether DePalma was actually in violation of any regulationbut two fact questionswhether BIU's Carrafa reasonably believed that DePalma was putting the company's license at risk and was motivated by that belief. There was no error and no abuse of discretion in the judge's rulings respecting the proposed expert witness or the requested jury charge.[9]

III.
We reject BIU's contentions respecting the counsel fee award, namely, that DePalma's application should have been rejected in its entirety as untimely, and that even if an award was allowable, the amount awarded was excessive.
In his August 9, 1999 order, Judge Snyder required DePalma's counsel fee application to be submitted within thirty days. However, BIU filed its notice of appeal approximately two weeks later. DePalma then filed a motion to dismiss the appeal as interlocutory because the counsel fee issue had not been resolved. We denied that motion on October 21, 1999 and remanded this appeal to the trial court "to determine the amount of the counsel fee award to Depalma ... within forty-five days."
We recognize that DePalma did not submit the required affidavit of services until the forty-fifth day, December 6, 1999. By filing his certification on the forty-fifth day following our remand order, it became impossible for Judge Snyder to meet the forty-five day deadline for completion. On December 21, 1999, Judge Snyder issued his final judgment including the fee award.
While we do not condone the late fee application, BIU does not argue that it was prejudiced by the last minute fee submission, and we discern no prejudice. In light of the procedural history, we cannot say that it was a mistaken exercise of discretion for the trial judge to have allowed the late fee application, thereby avoiding considerable prejudice to DePalma, albeit at his own attorney's hands.
BIU also argues that the counsel fee award was excessive and should be reduced. R. 4:42-9(a)(8) authorizes an award of counsel fees when permitted by statute. The Family Leave Act provides that "the prevailing party may be awarded reasonable attorneys' fees as part of the cost," N.J.S.A. 34:11B-12, making it a "fee-shifting" statute within the rule and subject to the holding of Rendine v. Pantzer, 141 N.J. 292, 661 A.2d 1202 (1995). The determination as to whether to award a counsel fee pursuant to the statute and the amount of such an award lies within the trial court's discretion. Muellenberg v. Bikon Corp., 277 N.J.Super. 67, 75, 648 A.2d 1161 (App.Div.1994), rev'd on other grounds, 143 N.J. 168, 669 A.2d 1382 (1996).
*862 In Rendine, the Court held that the first step in calculating a fee award under a fee-shifting statute is to determine the "`lodestar': the number of hours reasonably expended multiplied by a reasonable hourly rate." 141 N.J. at 334-35, 661 A.2d 1202. The determination of the lodestar "is the most significant element in the award of a reasonable fee because that function requires the trial court to evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application." Id. at 335, 661 A.2d 1202. DePalma's attorney submitted a certification after trial indicating that he, his associates, law clerks, and paralegals, spent 220.05 hours at rates ranging from $350 per hour (senior counsel) to $75 per hour (paralegals). The total lodestar fee sought was $68,848.25, plus $948.16 in out-of-pocket costs. The judge found both the hours expended and the hourly rates reasonable.
BIU contends that DePalma's counsel did not segregate the hours expended on his successful claim from the hours spent on unsuccessful claims, and that the judge should have substantially reduced the compensable hours.[10] However, when a plaintiff's claims include common facts or are based on related legal theories, then the "suit cannot be viewed as a series of discrete claims" for purposes of determining success. Silva v. Autos of Amboy, Inc., 267 N.J.Super. 546, 556, 632 A.2d 291 (App.Div.1993) (in awarding fee on successful Consumer Fraud Act claim, representing only one count of a seven count complaint, but all counts were interrelated factually and legally, trial court erred in awarding only one-seventh of the fee requested). If a plaintiff substantially prevails, counsel fees need not and generally should not be reduced on the ground that the plaintiff did not prevail on each separate cause of action advanced. Ibid. While the Court has instructed that "a trial court should reduce the lodestar fee if the level of success achieved in the litigation is limited as compared to the relief sought," Rendine, 141 N.J. at 336, 661 A.2d 1202, we view Rendine to direct our focus on the extent of the prevailing plaintiff's overall success, and not on fractionalizing the attorney's efforts to isolate and exclude hours assigned to dismissed counts. In the final analysis, the trial judge's discretion warrants considerable deference, and should "be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." Id. at 317, 661 A.2d 1202.
DePalma clearly succeeded in his core cause of action. He proved that BIU violated the Family Leave Act, and the jury awarded him $140,000 in compensatory damages and $400,000 in punitive damages. Neither the fact that DePalma's claims against the individual defendants were dismissed, nor that the jury made no award for loss of consortium, nor that Judge Snyder ultimately reduced the punitive damages award pursuant to the Family Leave Act, alters the fact of DePalma's overall success. Moreover, all of the claims presented to the jury (even those against the individual defendants and those of his wife) were based on a common set of facts and common proofs. We see no abuse of discretion in the trial judge's refusal to discount any of counsel's work as unrelated to the prevailing claims.
The Court also instructed in Rendine that trial courts are to consider whether to increase the lodestar fee "to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful *863 outcome." 141 N.J. at 337, 661 A.2d 1202. The Court concluded that "a counsel fee awarded under a fee-shifting statute cannot be `reasonable' unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." Id. at 338, 661 A.2d 1202.
In deciding on an enhancement, the trial court must consider whether the case "was taken on a contingent basis," "whether the attorney was able to mitigate the risk of non-payment," and whether the contingency of non-payment was aggravated by other economic risks. Id. at 339, 661 A.2d 1202. The likelihood of success also should be considered, since the risk of losing constitutes an economic disincentive to representing plaintiffs on a contingent basis in employment-related cases, and employees who lose their jobs generally cannot afford representation on any other basis. Enhancement of the lodestar is justified to ensure that attorneys will take risky but potentially meritorious cases. Id. at 340-41, 661 A.2d 1202.
Here, the fee agreement between DePalma and his attorney was entirely contingent upon the award, and success was hardly a sure thing. While the attorney sought "a substantial contingency enhancement," Judge Snyder did not award any enhancement, despite the contingent fee agreement and the risk of loss in the face of hotly disputed facts and contradictory evidence. Under all the circumstances we conclude that awarding the lodestar fee was a reasonable exercise of the trial judge's discretion and we will not intervene.

IV.
In his cross-appeal, DePalma contends that the judge erred in molding and reducing the jury's $400,000 punitive damages award to conform to the Family Leave Act, which provides that a successful claimant "may be awarded punitive damages in an amount not greater than $10,000.00." N.J.S.A. 34:11B-11. We are satisfied that any punitive damages award in a Family Leave Act cause of action is limited by the $10,000 cap set forth in that Act, and that a claimant under the Act cannot avail himself of the higher limit available under the more general Punitive Damages Act.
The Family Leave Act was approved January 4, 1990, and became effective 120 days later. L. 1989, c. 261. The Punitive Damages Act was approved on June 29, 1995, effective 120 days later. L. 1995, c. 142. The events that form the basis for DePalma's claim occurred in 1996, and his complaint was filed in May 1997. DePalma contends that his punitive damages award is limited only by the Punitive Damages Act, which provides that no "defendant shall be liable for punitive damages in any action in an amount in excess of five times the liability of that defendant for compensatory damages or $350,000, whichever is greater." N.J.S.A. 2A:15-5.14.[11]
After raising the issue, the judge gave the parties an opportunity to brief and argue the appropriate cap. Judge Snyder explained his decision to reduce the jury's $400,000 punitive damages award to $10,000:
The Family Leave Act was a specific act that dealt with this specific violation. And unfortunately for the plaintiff, limited punitive damages to a maximum of $10,000.

*864 So, what the Court did, sua sponte, subsequent to the entry of the verdict by the jury, the $400,000, sua sponte, I molded the verdict with respect to punitive damages from $400,000 to $10,000.
And I find that ... the law was very specific. Whereas the Punitive Damage[s] Act can be considered to be more general, where there's more specific legislation that deals with a specific area of the law, that's what the Court must look to.
DePalma contends that the Punitive Damages Act modified the Family Leave Act; the Family Leave Act's $10,000 cap on punitives no longer applies; the Punitive Damages Act's higher cap is controlling; and the jury's $400,000 punitive damages award should be reinstated. We disagree.
Our Supreme Court has recognized that "it is a well-established rule that where two statutes appear to be in conflict, and one is general in nature and the other specific, the conflict is resolved in favor of the more specific statute." State v. Gerald, 113 N.J. 40, 83, 549 A.2d 792 (1988) (quoting In re Salaries for Probation Officers of Hudson County, 158 N.J.Super. 363, 366, 386 A.2d 403 (App.Div.), certif. denied, 78 N.J. 339, 395 A.2d 208 (1978)); accord New Jersey Transit Corp. v. Borough of Somerville, 139 N.J. 582, 591, 661 A.2d 778 (1995); see also Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 130 (3d Cir.1998) (where the Third Circuit held that a statute dealing with a precise, specific subject is not superceded by a subsequently enacted statute which covers a more generalized topic, unless there is a clearly expressed contrary intention). We reject DePalma's reliance upon Patterson v. Cooper, 294 N.J.Super. 6, 13, 682 A.2d 266 (Law Div.1994), where the Law Division Judge limited "the principle that specific statutes trump general statutes [to circumstances] where the specific statute was enacted after the general statute."
In New Jersey Transit Corp. v. Borough of Somerville, 139 N.J. at 591, 661 A.2d 778, the Supreme Court held that a more specific statute regarding the procedure by which an aggrieved taxpayer can appeal a property assessment, N.J.S.A. 54:3-21, controlled over a more general statute concerning an extended limitations period for all civil actions commenced in New Jersey, N.J.S.A. 2A:14-1.2. Notwithstanding that N.J.S.A. 54:3-21 was enacted many years prior to N.J.S.A. 2A:14-1.2, the court expressly held that "[s]ince N.J.S.A. 54:3-21 is much more specific than N.J.S.A. 2A:14-1.2, the former prevails over the latter." Ibid.
When statutes deal with the same subject, even if one is specific and the other general, they should be read in pari materia and construed so that to the extent possible, each can be given its full effect. County of Camden v. South Jersey Port Corp., 312 N.J.Super. 387, 398, 711 A.2d 978 (App.Div.), certif. denied, 157 N.J. 542, 724 A.2d 801 (1998); Borough of North Haledon v. Bd. of Educ. of Manchester Reg'l High Sch. Dist., 305 N.J.Super. 19, 28, 701 A.2d 925 (App. Div.1997), certif. denied, 152 N.J. 363, 704 A.2d 1298 (1998).
Moreover, to the extent that there is any question whether the earlier, more specific Family Leave Act or the later enacted, more general Punitive Damages Act limit applies, we are guided by the apparent intent, or lack of intent, of the Legislature. In that regard, we have found no ambiguity but only plain meaning in the disputed provision of the Family Leave Act and no legislative history that casts any different light on the Act's $10,000 limit on punitive damages. Neither can we discern anything in the legislative *865 history of the Punitive Damages Act to suggest an intention to repeal or supercede the lower limit of the Family Leave Act. See Yacenda Food Mgmt. Corp. v. New Jersey Highway Auth., 203 N.J.Super. 264, 274, 496 A.2d 733 (App.Div.1985) ("The doctrine of implied repeal is disfavored in our law unless the later expression of the legislative will is so clearly in conflict with the earlier statute that the two cannot reasonably stand together."). The Legislature is presumed to have been aware of the six-year-old Family Leave Act's provision when it enacted the Punitive Damages Act in 1995. See Brewer v. Porch, 53 N.J. 167, 174, 249 A.2d 388 (1969); In re Keogh-Dwyer, 45 N.J. 117, 120, 211 A.2d 778 (1965); Yacenda Food Mgmt. Corp., 203 N.J.Super. at 273, 496 A.2d 733. Had the Legislature intended to increase the $10,000 cap of the Family Leave Act, it certainly could have done so.
The legislative history does not support plaintiff's argument. In enacting the Punitive Damages Act as part of a five-bill tort reform package,[12] the Legislature obviously intended to limit the availability and amount of punitive damages awards in most cases. See, e.g., N.J.S.A. 2A:15-5.11 (requiring a specific prayer for such relief to be included in the complaint); N.J.S.A. 2A:15-5.12a (requiring clear and convincing proof of a defendant's "actual malice or... wanton and willful disregard" of [foreseeable harm], and disallowing negligence, even gross negligence, as a ground for punitive damages); N.J.S.A. 2A:15-5.13e (barring joint and several liability for a punitive damages award); N.J.S.A. 2A:15-5.14b (capping the amount of a punitive damages award); and N.J.S.A. 2A:15-5.14a (requiring the trial judge to "ascertain that the award is reasonable" before entering judgment); see also Smith v. Whitaker, 160 N.J. 221, 247, 734 A.2d 243 (1999) (Justice Garibaldi, concurring in result). As Justice Garibaldi noted in that case, the Punitive Damages Act evidences a "clear legislative mandate indicating that the purpose of the [Punitive Damages] Act was to restrict punitive damages, rather than expand them." Id. at 248, 734 A.2d 243. It is therefore illogical to suggest that legislation which limited the availability and amount of punitive damages awards generally, should be deemed to have repealed an existing, substantially lower limit such as that set forth in the Family Leave Act.
DePalma nevertheless argues that because the Legislature expressly listed, in N.J.S.A. 2A:15-5.14c, certain statutes to which the cap set forth in N.J.S.A. 2A:15-5.14b did not apply, and because the Legislature did not include the Family Leave Act in that list, it is subject to and "modified" by the Punitive Damages Act. Closer consideration of sections b and c of N.J.S.A. 2A:15-5.14 does not support DePalma's interpretation. Whereas section b limits punitive damages "in any action," section c states that section b "shall not apply to causes of action brought pursuant to" certain statutes: N.J.S.A. 2A:53A-21 to -24 (civil liability for bias crimes); N.J.S.A. 10:5-1 to -42 (the New Jersey Law Against Discrimination); N.J.S.A. 26:5C-5 to -14 (civil liability for violation of the AIDS Assistance Act); N.J.S.A. 2A:61B-1 (civil liability for sexual abuse); or to cases against a defendant who was *866 convicted under N.J.S.A. 39:4-50 or50.4a for driving while intoxicated or refusing a breathalyzer test. It is apparent to us that in section c, the Legislature excluded certain causes of action it deemed particularly offensive and in need of additional deterrencecauses of action to which the Act's ceiling on allowable punitives would not apply.
The legislative history of the Punitive Damages Act supports our interpretation of section c as establishing a class of cases that the Legislature intended to exempt from any cap on punitive damagesclearly not a class to which Family Leave Act cases belong.[13] In its statement to Senate No. 1496, the Assembly Insurance Committee described the proposed cap and exemptions:
The committee amended the bill to provide that a defendant shall not be liable for more than five times the amount of compensatory damages or $350,000, whichever is greater. No cap shall apply, however, for the following causes of action: bias crimes, discrimination, AIDS testing disclosure, sexual abuse or drunk driving.

[Emphasis added.]
The Assembly Minority Statement to Senate No. 1496, opposing any cap on punitive damages, nevertheless confirms that the causes of action exempted from the proposed cap would have no cap:
Capping punitive damages allows malicious manufacturers to budget for future fines as a cost of doing business. This would significantly reduce the current law's incentives for making products safer.
The sponsors seem to recognize the validity of the arguments made by the minority for their amendments provide certain exemptions from the cap.... Caps are not in place for various individual defendants, such as drunk drivers and child molesters, but the caps will protect virtually every large, corporate defendant which willingly and knowingly injures innocent people.
Furthermore, the cap exemptions place the State in the untenable position of holding some victims as more important than others. A victim of bias crime or a drunk driver faces no cap on punitive damages, while a woman with silicone leaking into her body or a construction worker who can't breathe because of asbestos poisoning have their potential damages capped. The State should not be making legal distinctions between victims.
Because the Family Leave Act contained its own lower punitive damages cap, there was no reason for the Legislature to include the Act among the cases to which the Punitive Damages Act does not apply. Moreover, where the Legislature intended the Punitive Damages Act to supercede existing statutory guidelines for awarding punitive damages, as in the Products Liability Act, the Legislature expressly amended the existing law to delete those intentionally superceded provisions. See L. 1995, c. 142, § 8, deleting sections a, b, and d of N.J.S.A. 2A:58C-5. DePalma's attempt to infer some unstated legislative intent to substantially increase the existing cap on Family Leave Act actions is unsupported.
We also note that there are at least two other statutes containing specific dollar limits on punitive damages awards which *867 are not listed in N.J.S.A. 2A:15-5.14c as exceptions to the Punitive Damages Act. In 1995, shortly before enacting the Punitive Damages Act, the Legislature established a private cause of action for injury resulting from violation of the prohibition upon wrongful disclosure of grand jury proceedings. N.J.S.A. 2B:21-10b. That statute provided for "punitive damages of not less than $1,000.00 or more than $100,000.00." L. 1995, c. 44, § 1, effective June 5, 1995. And under 1980 legislation amended in 1981, a consumer who is "substantially confused" by a consumer contract that is not "written in a simple, clear, understandable and easily readable way" is entitled to punitive damages "up to $50.00." N.J.S.A. 56:12-3; N.J.S.A. 56:12-2. A class action brought on account of such a consumer contract may result in punitive damages "limited to $10,000.00" against any one defendant. N.J.S.A. 56:12-4. Neither of these more specific punitive damages limits are listed as exceptions in the Punitive Damages Act, yet we have no reason to believe that the Legislature intended to override such specific, lower statutory limits on punitive damages awards when it enacted the Punitive Damages Act.
We are convinced that Judge Snyder was correct in limiting plaintiff's punitive damages award to the $10,000 cap provided in the Family Leave Act.

V.
We reject as without merit and warranting no extended discussion, BIU's contention that the jury's substantial punitive damages award evidences "prejudice, sympathy, partiality, or passion" and therefore warrants "a new trial as to all issues." R. 2:11-3(e)(1)(E); cf. Smith v. Whitaker, 313 N.J.Super. 165, 202, 713 A.2d 20 (App. Div.1998), aff'd o.b., 160 N.J. 221, 734 A.2d 243 (1999) (there is no scale by which to measure a jury's punitive damages award, with which a court should not interfere unless it is "manifestly outrageous.").
Affirmed.
NOTES
[1] Donna DePalma's derivative claim for loss of consortium was rejected by the jury, and plaintiffs do not appeal that verdict. We therefore refer to plaintiff Michael DePalma in the singular as "plaintiff" or "DePalma" in this opinion.
[2] Plaintiff also alleged that BIU's owner, Russell McLaughlin, Sr., and president, Paul Carrafa, tortiously interfered with his "prospective economic advantage and his employment relationship with BIU." The judge dismissed those claims at trial. At oral argument, plaintiff expressly agreed to his attorney's withdrawal of that portion of his cross-appeal.
[3] DePalma was incorrect in describing "minor work" under the Code as exempt from building permit, inspection and certificate of occupancy requirements. However, under the applicable regulations, neither "ordinary repairs," N.J.A.C. 5:23-2.2(b), nor "ordinary maintenance," N.J.A.C. 5:23-2.7(a), requires a permit (or inspection or a certificate of occupancy).
[4] The certificate of incorporation of BCE includes the following language:

The purpose or purposes for which the Corporation is organized are to perform building and plumbing inspections for compliance with the Uniform Construction Code of New Jersey, N.J.A.C. 5:23-3.1 et seq. and N.J.S.A. 52:270-119 et seq. which regulates the structural design, maintenance, construction and use of buildings or structures to be erected and alteration, renovation, rehabilitation, repair, removal or demolition of buildings or structure already erected.
[5] BCE's "Authorization Application" for "Private On-site Inspection and Plan Review Agencies" filed with the DCA, was dated April 29, 1996. BCE's temporary insurance binder describing its operations as "New Construction Inspection for Building & Plumbing Code Enforcement" bears effective dates "4-26-96 [to] 5-26-96."
[6] DePalma conceded that he did not explicitly ask for leave under the Family Leave Act, because he was unaware of the statute at the time. BIU does not contend DePalma's request for leave did not qualify under the Act, and we deem any such contention waived. See Pressler, Current N.J. Court Rules, comment on R. 2:6-2.
[7] Family leave required by the Act may be paid, unpaid or a combination of the two. N.J.S.A. 34:11B-4d.
[8] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973).
[9] We also note that when DePalma asked in its interrogatory # 7 that BIU set forth any regulation relevant "to the conduct of any party," BIU failed to list the conflict-of-interest regulation upon which it relied at trial. Nor did BIU give notice that it would request the court to take judicial notice of that regulation. See N.J.R.E. 201.
[10] BIU does not challenge plaintiff's counsel's hourly rates as being excessive.
[11] The $400,000 punitive damages awarded by the jury obviously falls within the five-times-compensatory-damages limit of the Punitive Damages Act.
[12] In addition to the Punitive Damages Act, the tort reform package included L. 1995, c. 139 (enacting N.J.S.A. 2A:53A-26 to -29, the affidavit of merit statute); L. 1995, c. 140 (amending N.J.S.A. 2A:15-5.2 to limit joint and several liability); L. 1995, c. 141 (amending N.J.S.A. 2A:58C-8 and -9 to limit strict liability of a product seller); L. 1995, c. 143 (further amending the Products Liability Act to limit liability of certain health care providers with respect to medical devices).
[13] While Family Leave Act claims are handled procedurally like LAD claims, in that they can be filed with the Division on Civil Rights and are subject to similar burdens of production and evidence, there is no basis for concluding (and DePalma does not contend) that no cap applies to punitive damages awards under that act.