**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5652-18

MIN AMY GUO,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

NOVARTIS PHARMACEUTICALS
CORPORATION,

      Defendant-Appellant/
      Cross-Respondent.

_____

Argued February 3, 2022 – Decided July 25, 2022

Before Judges Haas, Mawla, and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1486-14.

John B. McCusker argued the cause for appellant/cross-respondent (McCusker, Anselmi, Rosen & Carvelli, PC, and Porzio, Bromberg & Newman, PC, attorneys; John B. McCusker, Patricia Prezioso and Patrice LeTourneau, on the briefs).

James K. Webber argued the cause for respondent/cross-appellant (Webber McGill LLC, and

Richard J. Murray, attorneys; James K. Webber, Douglas J. McGill, and Richard J. Murray, on the briefs).

PER CURIAM

Defendant Novartis Pharmaceuticals Corporation appeals from an August 27, 2019 judgment following a jury verdict in plaintiff Min Amy Guo's favor pursuant to the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, and awarding her counsel fees. Plaintiff cross-appeals from the same judgment following the jury's verdict in defendant's favor on its unjust enrichment counterclaim and she challenges the counsel fees and the no-cause verdict on punitive damages. We affirm both the appeal and the cross-appeal.

We discern the following facts from the record. Plaintiff began working for defendant in 2008 as senior director of a new health economics outcome research (HEOR) department within its oncology division. The department was tasked with conducting research regarding the economic efficacy of treatment plans and pharmaceuticals. Over the following several years, plaintiff received positive performance reviews and earned a promotion to executive director and salary increase in March 2012. By the time of her termination, she earned an annual salary of $223,678, as well as cash and stock incentive awards through defendant's annual incentive plan (AIP) and stock incentive plan (SIP), albeit

subject to claw-back in the event of misconduct pursuant to the rules of each respective plan. In the event of an employee's noncompliance with the law, the company's code of conduct, or any provision of the company guidelines, the AIP explicitly set forth avenues for recovery of any incentives already paid to the employee. The SIP likewise required a participant's adherence to the same company policies, including the code of conduct, under the same terms.

During plaintiff's employment, as part of its settlement of a lawsuit brought by the U.S. Department of Justice alleging violations of the False Claims Act (FCA), 31 U.S.C. § 3729 to -33, and Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), defendant entered into a corporate integrity agreement (CIA) in 2010, requiring that it implement and adhere to policies and procedures to ensure its compliance with federal law, including the FCA and AKS. Consistent with those policies, defendant provided plaintiff training regarding compliance with the CIA and, by extension, the AKS. Plaintiff's understanding from that training, as pertinent here, was that the company could violate the AKS by paying a distributor for a study of negligible scientific value as a kickback for purchasing and distributing its product. In that connection, defendant does not sell any of its products directly to the general public; rather,

it sells them to firms such as McKesson Corporation (McKesson), which in turn sells them to pharmacies.

In June 2012, while approval for a new indication to treat breast cancer for Afinitor remained pending, Christi Shaw, head of defendant's oncology division, met with Grant Bogle, a senior marketing executive at McKesson, to discuss the drug's launch. Shaw discussed with Bogle the possibility that McKesson might perform an HEOR study of Afinitor to support the launch.

Early the following month, Greg Grabavoy, head of defendant's Oncology Scientific Operations – Managed Markets (OSOMM) group, sent an email message to Shaw apprising her of a proposed study from McKesson, at a cost to defendant of $248,500, that would examine McKesson's doctors' existing off-label use of Afinitor to treat their breast cancer patients. He described the proposal as a "customer engagement project" that offered a "very quick turnaround time prior to launch" and suggested a telephone conference the following week to "expedite approval/funding." Despite the HEOR group's responsibility for evaluation of such studies, he failed to include anyone from the group as an email recipient.

Plaintiff contended, in support of her CEPA claim, that once she learned of the proposal, she reasonably believed its approval could constitute the sort of

kickback that might run afoul of defendant's CIA and federal law. She testified at trial that she believed approval of the study, and particularly its expedited approval, would violate numerous compliance principles, noting that the proposal had been made by commercial leaders rather than qualified health economists, that it was not accounted for in defendant's annual budget, and that it would entail off-label usage. Plaintiff promptly sent an email to her supervisor, Steven Stein, and to Shaw, complaining that her HEOR group had not been "kept in the loop" about the proposal, observing that the study seemed impossible to viably complete prior to the drug's launch, and cautioning that "[p]er [the] CIA, all customer studies w[ould] have to go through Medical and HEOR review and approval for medical soundness and methodology rigor, and we are required to document the review and approval of the study protocol." Over the next few days, on further review of the proposal, plaintiff sent another pair of emails to Stein describing what she believed to be several flaws in the study.

On July 6, 2012, Peter Kwok, an employee in the OSOMM group, mentioned plaintiff in an email to Grabavoy and expressed concern about her involvement in the process and the implication for expedited approval:

> Can you confirm with Christi that she wants us to move
> forward with a proposal since [McKesson] is expecting

5

a quick response from [Novartis]? Or are we going to "wait" for Amy? I think it is unwise to have another "internal review" by Amy and her group; doing so not only means we will likely miss the "deadline" that Christi had originally set for an August completion, it will also send a wrong signal to [McKesson] since they quickly turned this proposal around.

Another email from Kwok to his superiors in the company a few days later added that this "was <u>not</u> intended to be an HEOR study as we have structured the deliverables over . . . [seven] weeks['] time to meet Christi's desire to have the results ready at product launch."

Despite defendant's modification of the proposal responsive to plaintiff's comments in some respects, plaintiff continued to raise concerns about the study and its approval process, both in writing and in conversations with other supervisors over the course of the following month. In email messages in late July, she advised that the appropriate procedure would need to be followed "to ensure rigor and minimize risk" and that the study "require[d] HEOR analytical/methodological skills to maximize the value of the study and minimize risk." Moreover, according to plaintiff, when she told her supervisor, Ling Wu, "about [the] policy violations," the "processes being broken," and "potential anti-kickback" implications, Wu asked whether Shaw and Stein were

supporting the approval and, when plaintiff responded in the affirmative, warned plaintiff to "back off."

In late July 2012, Madhav Namjoshi, one of plaintiff's subordinates, approached plaintiff and expressed concerns about the proposed study, recalling an email in which Kwok had appeared to place commercial interests above the scientific rigor of the approval process by stating, "[w]e like to engage [McKesson] because they are a key customer, the largest GPO in the country, and have significant impact on the 'drug purchase' as well as 'influence' with payers[.]" Yet plaintiff failed to bring Namjoshi's concern to Wu's attention until the following week, at which point Wu advised plaintiff to report the issue to William "Charlie" Lucas in the ethics and compliance department.

Plaintiff did so the same day, and Lucas noted in his memorialization of the conversation his agreement "that the appropriate review process was important in order to ensure the scientific validity of the project and that it avoid any suggestion we are engaging in a study as an inducement for the customer to purchase our products." Lucas contacted defendant's Business Practice Office (BPO), which declined to conduct an investigation of the matter itself but assigned Lucas to do so.

In the course of that investigation, Lucas interviewed the recipients of Kwok's email and others who were reviewing McKesson's proposal and ultimately concluded that the email had been poorly worded but did not evidence any impropriety and that in any event, the proposed study was at that point no longer being pursued. He recommended that all recipients of the email, including plaintiff, receive coaching regarding seeking legal or compliance advice about "manag[ing] poor documentation" and that plaintiff also receive coaching "about reporting policies for potential compliance violations," given her failure to promptly report Namjoshi's complaint to compliance.

On August 23, 2012, Namjoshi and James Turnbull, another of plaintiff's subordinates, approached Tina Grasso, a senior director in the oncology department, to report that plaintiff had directed them to evade the legal and compliance departments regarding two studies for which defendant's vendor had failed to obtain proper approval from an institutional review board, as they believed was required by federal regulation. Grasso reported the issue to Lucas, who again contacted the BPO, an action which plaintiff admitted at trial had been appropriate. The BPO initially assigned Lucas and the oncology compliance department to investigate, pursuant to guidance from the legal department, though Lucas was eventually replaced in that role by his colleague

8

Annabel Nau after the investigation expanded into areas where Lucas had provided guidance on compliance to plaintiff's HEOR group.

Investigators interviewed plaintiff on three occasions, as well as more than two dozen other witnesses, and reviewed voluminous documentary material, some of it provided to them directly by plaintiff. Moreover, they considered numerous further allegations aside from those that had initially spurred the investigation, including from Virginia Lazala, head of the oncology legal department. The investigation ultimately substantiated, in part based on plaintiff's admissions, numerous violations of company policy, including that she had drafted a review procedure without consulting the legal department, conducted two HEOR studies without proper approval, discouraged subordinates from raising potential legal and compliance issues with the appropriate departments, pushed for approval of another study without disclosing any conflict of interest, consulted with a vendor's attorney regarding regulatory compliance rather than defendant's own counsel, and failed to correct overpayments to customers above fair market value. Yet the investigative report, issued in April 2013, made no recommendation as to any appropriate disciplinary measures.

9

While that investigation remained pending, in March 2013, plaintiff received a positive performance review for the prior year and a bonus, and defendant expanded her group's responsibilities and allowed her to hire another associate. In May 2013, however, an internal review committee (IRC), comprising reviewers from the human resources, compliance, and legal departments, recommended retraining and other disciplinary action short of termination for the other employees involved in the violations detailed in the investigative report, but recommended termination for plaintiff in light of the severity of her violations and her leadership role within the organization.

Wu, Shaw, and Stein, as plaintiff's supervisors, formally requested that the IRC reconsider that recommendation, suggesting that plaintiff instead be placed on a performance improvement plan, but the IRC affirmed it, explaining that the pattern and severity of her transgressions demanded nothing less than termination. Her supervisors then appealed to a global internal review committee, but that committee reached the same recommendation, adding that plaintiff's judgment had been poor and that the committee was not confident she would prospectively refrain from similar misconduct. Her supervisors accepted that result and rationale, and defendant terminated her employment in July 2013. Defendant offered her a severance package.

On June 13, 2014, plaintiff filed a complaint against defendant, alleging she had been terminated from her employment in violation of both CEPA and the common law. On September 12, 2014, defendant filed an answer and counterclaims for breach of contract and unjust enrichment, among other claims.

On August 17, 2018, after a protracted period of discovery, the motion judge denied a motion by defendant for summary judgment. In denying the motion, the judge concluded plaintiff presented sufficient evidence to substantiate her claim. As the judge recounted, plaintiff had stated that she believed that Kwok's email regarding the proposed study raised potential violations of the CIA, which had been formulated to ensure compliance with the AKS, and defendant's expert confirmed that the CIA required defendant to notify appropriate authorities of a probable violation of that sort. There was therefore sufficient evidence in the record to support that she had an "objectively reasonable belief that there was a substantial nexus between the complained of conduct" and the CIA and the AKS. With regard to whistleblowing activity, plaintiff had at least formally brought her subordinate's complaint to Lucas's attention, which led to her investigation and the adverse employment action of her termination.

A-5652-18

The judge further noted both that plaintiff had satisfied her initial burden and that defendant had adequately substantiated its purported legitimate reasons for termination, leaving the burden on plaintiff to demonstrate that those reasons were pretextual. But the judge concluded she had introduced sufficient evidence to require submission of the issue to a jury, noting that none of the other employees who failed to report the same email message were terminated and that plaintiff had been viewed as delaying the proposed study, which would have "benefited [defendant] immensely." Defendant was therefore not entitled to summary judgment on the claim.

Trial was held before a jury from January 2, 2019 to February 26, 2019. At trial, both parties moved for a directed verdict, but the judge reserved his decision.

At the conclusion of trial, the judge instructed the jury that in order to prove the first element of her CEPA claim, plaintiff needed to "establish that she reasonably believed that the proposed McKesson . . . study and the approval process was either . . . in violation of the law or rule or a regulation issued under the law" or "would have been compatible with a clear mandate of public policy concerning public health, safety or welfare[.]" The judge mentioned the project approval process in response to plaintiff's theory that because the CIA required

the company to make and adhere to policies to ensure compliance with the AKS,

misconduct related to the approval process could also implicate the AKS. The

judge also instructed, "[t]o prove the second element of her claim, plaintiff must

establish that she complained or actually blew the whistle."

The judge provided the following instruction on CEPA's third element:

> To prove the third element of their claim, the plaintiff must establish that the defendant took an adverse action against her. Adverse action can be a termination, suspension, demotion, or any other employment action taken against an employee in the terms and the conditions of their employment.
>
> The parties in this case do not contest that [defendant] terminated [plaintiff's] employment. That is considered an adverse action. The plaintiff claims it was retaliatory. [Defendant] claims she was an employee and [defendant] properly terminated her after an internal investigation because of her misconduct and that retaliation was not a determinative motivating factor in [defendants'] decision to terminate her.
>
> Plaintiff claims that the internal investigation itself was an adverse action for the retaliation or the retaliative motive. Again, it is for you, the jury, to decide which to believe.

Finally, the judge instructed as follows:

> In order to prove the final element and to prevail in her case the plaintiff must prove by a preponderance of the evidence the existence of a causal connection between her reporting, complaining, or objecting to the McKesson . . . study which is her blowing the whistle

13

and the adverse employment action taken by her employer.

In other words, there must be a connection between the whistleblowing and the termination. It's the plaintiff's burden to prove that it is more likely than not that [defendant] engaged in intentional retaliation against the plaintiff because she blew the whistle or in other words, reported, complained, or made objections to her supervisors regarding her objectively reasonable belief that the McKesson . . . study violated the anti-kickback statute or CIA.

That's really the ultimate issue for you to decide in this case. Did [defendant] intentionally terminate [plaintiff] because she blew the whistle . . . .

After the trial, the jury returned a verdict awarding plaintiff $1,816,040 on her CEPA claim. The jury also awarded defendant $345,360.79 on its counterclaim for unjust enrichment.

The jury also issued a verdict denying plaintiff any punitive damages after a brief trial on that issue. During the punitive damages trial, the judge agreed to plaintiff's request to include Lisa Goldman, defendant's chief compliance officer, as well as Shaw and Lazala as upper management employees in his instructions to the jury. The judge declined to include Lucas and Nau because although they worked in the compliance department, they took direction from Goldman and thus could not qualify as upper management. It further declined to include Liz McGee, an attorney who eventually replaced Lazala as executive

14

A-5652-18

director of the legal department and who participated in plaintiff's investigation by interviewing Shaw, offering only that, "[w]hether she was involved [in the investigation] or not, I don't think she's upper management in the sense that we're looking for."

On March 26, 2019, the judge denied motions by both parties for judgment notwithstanding the verdict (JNOV). The judge acknowledged that there had been "little direct evidence" supporting any element of plaintiff's claim but concluded that she had presented sufficient circumstantial evidence to permit a rational juror to return the verdict in her favor. The judge reasoned that both testimony and documentary evidence suggested that plaintiff was left out of the initial legal and compliance review chain for the proposed study and that once it was presented to her for review, she raised numerous objections, some to the effect that the proposal could be interpreted as a payment to McKesson to induce the distributor to push defendant's product in violation of the AKS. Moreover, even if plaintiff had been mistaken in that regard, the record showed that other employees initially shared the same perception, supporting the notion that her belief was a reasonable one.

The judge further recounted that the AKS was "very broad in its efforts to prevent abuse in this area of the pharmaceutical business[,]" and noted that

15

Kwok's email could be construed to suggest defendant should approve the study for reasons prohibited under that statute. The judge reiterated that the other employees investigated in conjunction with plaintiff had been disciplined rather than terminated, that plaintiff was fired despite her otherwise satisfactory performance record, her immediate supervisor appealed for reconsideration of the recommendation for termination, and that other superiors had recommended counseling instead. Because reasonable minds could have differed on this record, the judge concluded defendant was not entitled to a JNOV.

In rejecting plaintiff's motion for JNOV, the judge reasoned that "[o]ur law only prohibits double recovery for alternate claims out of the same set of facts[,]" but that had not been the case here. The judge recounted that there had been considerable evidence in the record demonstrating that plaintiff had violated defendant's code of conduct and other policies governing conflicts of interest, ethics, and compliance, and that she discouraged subordinates from seeking appropriate advice and approvals. Indeed, despite warnings and coaching for prior noncompliance, she sought advice from a vendor's attorneys, rather than defendant's, regarding the need for regulatory approval of a proposal, and hired outside counsel to train defendant's employees. The judge concluded there was "ample evidence" establishing that she had "inequitably placed her

own self-interest" over her employer's and unjustly enriched herself at defendant's expense, contrary to the company's code of conduct.

On August 8, 2019, the judge granted defendant an award reimbursing it for the $8,466 in attorney's fees it had expended due to plaintiff's disruptive conduct during trial. The following day, the judge issued an order and opinion granting plaintiff $1,531,434.54 in attorney's fees and costs on her CEPA claim. In calculating plaintiff's award of attorney's fees, the judge arrived at a reasonable rate of $350 per hour for the services of counsel Webber McGill's lead attorney, consistent with the rate represented in the firm's retainer agreement with plaintiff. She set rates ranging from $200 to $300 per hour for other attorneys from the same firm on careful, thorough consideration of their relative levels of experience, education, and role in the litigation. For solo practitioner Richard J. Murray, the judge concluded a rate of $450 per hour would be appropriate, based on similar considerations and in light of his award calculated with the same rate in another recent CEPA case.

The judge then undertook a thorough review of the attorneys' billing records, carefully identifying redundancies and other excess expenditures of time, as well as those expenditures for which he found the documentary support was lacking and reducing the total number of billable hours accordingly. On

careful consideration of the relevant legal factors, the judge concluded that the fee awards would not be reasonable absent some enhancement but reduced that enhancement in light of defendant's success on the unjust enrichment claim and other mitigating factors, thereby arriving at figures of $940,916.25 for Webber McGill and $484,076.25 for Murray.

On August 27, 2019, the judge issued a final order. These appeals followed.

On appeal, defendant presents the following arguments for our consideration:

> POINT I
>
> THE COURT SHOULD HAVE GRANTED [DEFENDANT'S] MOTIONS FOR SUMMARY JUDGMENT DIRECTED VERDICT, AND JNOV BECAUSE THE EVIDENCE SHOWED THAT PLAINTIFF DID NOT IDENTIFY ANY ILLEGAL CONDUCT, DID NOT ENGAGE IN PROTECTED ACTIVITY, AND WAS TERMINATED FOR EGREGIOUS MISCONDUCT UNRELATED TO ANY ALLEGED WHISTLEBLOWING.
>
>> A. Plaintiff Failed To Meet The First Prong of CEPA Because She Did Not Demonstrate A Reasonable Belief That A Violation Of Law Or Public Policy Had Or Would Imminently Occur.
>>
>>> i. The Internal Process For Reviewing Research Proposals

Has No Substantial Nexus To The Anti-Kickback Statute.

ii. The CIA Also Has No Standard For Reviewing Research Proposals And Is Not A Clear Mandate Of Public Policy.

iii. Plaintiff Did Not Demonstrate Any Wrongdoing With Regard To the McKesson Proposal.

B. Plaintiff Failed To Meet The Second Prong of CEPA Because She Did Not Engage In Any Protected Whi[s]tleblowing Activity.

C. Plaintif[f]'s Serious Misconduct Warranted Termination [And] Was Wholly Unrelated To Alleged Whistleblowing.

i. There Was No Evidence That The Investigati[o]n was Retaliatory Or Pre-Determined to Terminate.

ii. Plaintiff Never Suggested That She Believed There Was Any Illegality Occurring.

iii. Plaintiff Admitted To Much Of The Misconduct Alleged By Her Subordinates And Coworkers.

19

iv. The Only Support For Pretext Was Plaintiff's Speculation.

v. Plaintiff Admitted Lucas Was Required To Report The Allegations Of Her Misconduct And There Was No Evidence That Any Investigator Acted With Any Retaliatory Motive.

vi. There Was No Comparator Evidence To Support Pretext Since Plaintiff Alone Committed Serious Acts of Misconduct.

POINT II

THE DUAL VERDICT UNDERSCORES THE COURT'S ERROR IN DENYING [DEFENDANT] JNOV ON PLAINTIFF'S CEPA CLAIM.

POINT III

THE TRIAL COURT'S JNOV OPINION CONTAINS ERRONEOUS FACTUAL AND LEGAL FINDINGS THAT CANNOT BE UPHELD BY THIS COURT.

A. The Trial Court Failed To Identify A Substantial Nexus To Any Law Or Public Policy Or Point To Any Protected Activity.

i. The Trial Court Pointed To No Evidence Of Whistleblowing.

20

ii. The Court Acknowledged That Plaintiff Could Not Have Reasonably Believed Approval Of McKesson's Proposal Was Imminent.

iii. Plaintiff Admitted It Was Not Her Job To Ensure Proposals Complied With The Law.

iv. Plaintiff Never Expressed That She Thought The Proposal Could Be Interpreted Simply As A Payment To McKesson.

v. There Is No Evidence That Anyone Thought The Proposal Was Unlawful.

vi. The Court Conflated The Kwok Email With The McKesson Proposal.

B. The Court Pointed To Nothing But Unreasonable And Erroneous Inferences To Justify A Finding That Plaintiff Met Her Burden Of Establishing Pretext.

i. The Court Ignored That Plaintiff, Unlike All The Other Employees Disciplined, Was Terminated For A Pattern of Serious Policy Violations.

ii. There Was No Evidence to Support The Court's Inference

21

That Shaw Engaged In Misconduct.

iii. The Study Proposal Had No Impact On The Launch And [Carlos] Garay,[1] Who Criticized The Proposal, Was Promoted.

POINT IV

THE COURT INCORRECTLY INSTRUCTED THE JURY THAT IT COULD FIND PROTECTED ACTIVITY BASED UPON COMPLAINTS ABOUT THE COMPANY'S INTERNAL "APPROVAL PROCESS" AND COULD FIND THE INVESTIGATION ITSELF RETALIATORY.

A. The Court Incorrectly Instructed The Jury Thirteen . . . Times That Complaints About Internal "Approval Process" Could Constitute Whistleblowing.

B. The Jury Was Wrongfully Instructed That It Could Find The Investigation Itself [Was] Adverse Action.

POINT V

PLAINTIFF IS NOT ENTITLED TO AN AWARD OF COUNSEL FEES FOR HER FAILED DEFENSE AGAINST THE COUNTERCLAIMS, LET ALONE ENHANCED FEES.

---

1 Executive Director of Solid Tumors and lead reviewer of the study.

22

On cross-appeal, plaintiff presents the following arguments for our consideration:

POINT I

DEFENDANT'S UNJUST ENRICHMENT JUDGMENT SHOULD BE REVERSED AS A MATTER OF LAW.

POINT II

THE LOWER COURT ABUSED ITS DISCRETION IN AWARDING PLAINTIFF'S COUNSEL REDUCED FEES.

A. The Applicable Law Favors Plaintiff.

1. The Standard Of Review.

2. Establishment Lodestar Award.

i. Establishing Appropriate Hourly Rates.

ii. Principles For Approving Time Entries.

B. The Lower Court Abused Its Discretion In Awarding Webber McGill A Reduced Lodestar.

1. The Lower Court Imposed An Impermissible Rate "Ceiling" Based On Webber

23

McGill's Engagement Letter With Plaintiff.

2. The Lower Court Erred By Failing To Award A Fee Based On Current Market Rates As Established By Uncontroverted Attorney Certifications.

3. The Lower Court Abused Its Discretion In Imposing Across-the-Board Rate Reductions For Attorneys Who The Court (Mistakenly) Believed Did Not Actively Participate At Trial Or In Motion Practice.

4. The Lower Court Abused Its Discretion By Arbitrarily Disallowing Significant Amounts of Time And By Failing To Identify With Requisite Precision Which Time Entries It Reduced and/or Cut

C. The Lower Court Abused Its Discretion In Awarding . . . Murray A Reduced Lodestar.

1. The Lower Court Erred By Failing To Award A Fee Based On Current Market Rates.

2. The Lower Court Abused Its
Discretion In Reducing Hours
Expended By . . . Murray.

D. The Trial Court Erred By Relying On
Inappropriate Factors To Limit Plaintiff's
Counsel's Fee Enhancement.

POINT III

THE LOWER COURT ERRED IN REFUSING TO
GRANT PLAINTIFF'S SUPPLEMENTAL FEE
APPLICATION.

POINT IV

THE TRIAL COURT COMMITTED REVERSIBLE
ERROR IN THE PUNITIVE DAMAGES TRIAL.

A.

Defendant first argues that the judge erred by denying it judgment as a matter of law at various stages of the proceedings—at summary judgment, at the close of plaintiff's case, and after the verdict. We review a trial court's decision on motions for summary judgment, directed verdict, and JNOV de novo, applying the same standard as the trial court. See, e.g., Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998); Luczak v. Twp. of Evesham, 311 N.J. Super. 103, 108 (App. Div. 1998); Barber v. ShopRite of Englewood & Assocs., 406 N.J. Super. 32, 52 (App. Div. 2009).

A court may grant summary judgment only where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). An equivalent standard applies to a motion for a directed verdict at trial. Frugis v. Bracigliano, 177 N.J. 250, 269-70 (2003). Finally, the court may grant a motion for JNOV only "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a).

The CEPA provides in relevant part that:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . or
> >
> > . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

26

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . [or]
>
> . . . .
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
>
> [N.J.S.A. 34:19-3.]

The statute defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e).

To prevail on a claim for violation of those provisions, the employee must establish that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in [CEPA]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003).]

The employer's conduct need not have actually violated a law or clear mandate of public policy; it suffices that the employee held a reasonable belief that it did. Ibid. Nonetheless, there must be an identifiable "statute, regulation,

27

rule, or public policy that closely relates to the complained-of conduct[,]" the absence of which will compel judgment in the employer's favor. Id. at 463. As for causation, that element need not be satisfied by direct evidence but may instead "be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action[.]" Maimone v. City of Atl. City, 188 N.J. 221, 237 (2006). That may include "[t]he temporal proximity of employee conduct protected by CEPA and [the] adverse employment action[,]" ibid., though "[t]emporal proximity, standing alone, is insufficient to establish causation." Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 361 (App. Div. 2002).

Once the employee establishes a prima facie case pursuant to that framework, the burden of production shifts to the employer

> to advance "a legitimate, non-discriminatory reason for its rejection of the employee." The plaintiff retains the ultimate burden of proving that the retaliatory motive played a determinative role in the adverse decision. As in any cause of action, plaintiff can meet that burden by means of circumstantial as well as direct evidence, or a combination of the two. One way the employee can do this is by proving that the employer's articulated reason "was not the true reason for the employment decision but was merely a pretext for discrimination."
>
> [Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 292 (App. Div. 2001) (internal citations omitted)

(quoting Bergen Com. Bank v. Sisler, 157 N.J. 188, 211 (1999)).]

Ultimately, the employee must prove by a preponderance of the evidence that the employer's retaliation "was more likely than not a determinative factor" in its decision with regard to the adverse employment action. Id. at 293 (quoting Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999)).

## I.

On appeal, defendant first argues that plaintiff failed to show she had a reasonable belief that any violation of law or public policy had occurred or was imminent. It contends, moreover, that there was no substantial nexus between the violation of defendant's internal approval process about which plaintiff complained and either the AKS or CIA, neither of which prescribed any requirements for such an approval process, and the latter of which did not even qualify as either a law or a clear mandate of public policy in the first place. Defendant also asserts plaintiff did not demonstrate any wrongdoing with regard to the McKesson proposal.

We reject, as did the trial judge, defendant's assertion that the proofs were insufficient to establish plaintiff's reasonable belief that the law was being violated. Plaintiff's testimony and documentary evidence showed that she had specifically voiced to Wu and Lucas her belief that the McKesson study was a

kickback that violated the CIA, which in turn was designed to ensure compliance with the AKS. She had received training on the policies after Novartis was heavily sanctioned by the federal government for violations of the AKS and the FCA. Plaintiff's understanding from that training was that the company could violate the AKS by paying a distributor for a study of negligible scientific value as a kickback for purchasing and distributing its product. Other employees shared her perception that approval of the study might be improper on that ground, particularly in light of the "unfortunately worded" email from Kwok. The trial judge correctly concluded that the evidence was sufficient to support an inference that plaintiff's belief had been objectively reasonable. As for the nexus between the AKS and the misconduct of which plaintiff complained, plaintiff's emails and other communications showed that she took issue, not only with defendant's adherence to the approval process, but also with the perceived kickback in violation of both the AKS and the CIA, which was meant to ensure defendant's compliance with the AKS. As the judge aptly concluded, the evidence was sufficient to show a substantial nexus.

## II.

Defendant next argues that plaintiff failed to demonstrate that she had engaged in any protected whistleblowing activity. This argument ignores that

plaintiff explicitly mentioned the notion of a kickback in her July 2012 conversation with Wu, and it was the jury's prerogative to determine whether to credit that account. See State v. Feaster, 156 N.J. 1, 81 (1998) (noting the jury's exclusive prerogative to evaluate witness' credibility and find of facts based on record). Moreover, Lucas' memorialization of his initial conversation with plaintiff in his report mentioned concern that approval of the study could be perceived as "an inducement for the customer to purchase our products[,]" albeit without using the specific term "kickback." The jury could reasonably conclude that those communications constituted protected whistleblowing activity. As for plaintiff's subjective belief on the subject, we note that plaintiff's trial testimony indicated that she did not know at the time whether Shaw was engaging in any kickback scheme but was "concerned." Her testimony was not that she affirmatively did not believe Shaw engaged in such impropriety.

### III.

Defendant next argues the judge erred in finding the evidence supported an inference of retaliation, claiming that plaintiff's serious misconduct warranted her termination and the firing bore no relationship to the alleged whistleblowing. Defendant reasons that there was no direct evidence defendant had conducted the investigation in retaliation for her complaints. Defendant

31

asserts that plaintiff never suggested that she believed there was any illegality occurring and acknowledged much of her own misconduct. Defendant contends the disciplinary actions taken as to the other employees who failed to report Kwok's email did not constitute a viable comparison for plaintiff's treatment in evaluating causation because plaintiff's termination was brought about by further misconduct discovered only after the initial investigation that resulted in the lighter discipline to the others.

We reject these arguments and agree with the judge that evidence of other disciplinary actions, the timing and outcomes of those actions, and evidence that defendant resented plaintiff's holding up the approval process for an important and financially beneficial proposal, sufficed to support an inference of retaliation. The jury was not bound to simply accept defendant's evidence, considerable though it may have been, at face value. See ibid. There was enough for the jury to determine that the retaliation and not plaintiff's misconduct was the reason plaintiff was terminated.

## IV.

Defendant next contends that the mixed verdict should have compelled the court to grant its JNOV motion. Yet defendant acknowledges that when the jury asked during deliberations whether the verdicts could be "mutually

exclusive," the parties agreed that it could, betraying defendant's understanding that these results were not inherently irreconcilable. Indeed, the jury could find from the record that plaintiff had engaged in numerous violations of company policy justifying the claw-back of prior incentive awards on the unjust enrichment claim but that her complaint about the McKesson study, given the coincidence of its timing and of the investigation revealing the other violations, nonetheless was a decisive factor in defendant's decision to terminate her employment. Nor was the size of the unjust enrichment award of any moment, as defendant asserts, because the measure of the award was the value of those prior incentives, not the severity of plaintiff's misconduct.

## V.

Finally, defendant asserts that the judge relied on mistaken factual findings and legal conclusions to deny its JNOV motion. It complains that the judge failed to identify a substantial nexus to any law or public policy or point to any protected activity and that the judge pointed to no evidence of whistleblowing. Defendant contends that plaintiff could not have reasonably believed approval of the McKesson proposal was imminent; that plaintiff, as an economist, was not actually responsible for determining whether that or any other proposal complied with the law; that plaintiff never actually expressed a

33

belief at the relevant time that she believed the McKesson proposal could be interpreted as a kickback; or that anyone else believed the proposal to be unlawful. Defendant also asserts the judge conflated the Kwok email with the McKesson proposal. It argues, moreover, that there was no basis for the notion that defendant's asserted reason for plaintiff's termination was pretextual, arguing that the judge ignored that plaintiff was terminated for a pattern of serious policy violations, that there was no evidence to support the judge's inference that Shaw engaged in misconduct, and that the study proposal had no impact on the launch.

Defendant's objections are without merit. First, while the judge acknowledged Stein's statement that he would not approve the proposal until plaintiff had reviewed it, a juror could nonetheless reasonably infer from communications in the record regarding Shaw's desire for expedited review that plaintiff reasonably believed the proposal's inappropriate approval might be imminent. Moreover, while plaintiff was certainly not a legal expert, ample evidence in the record showed that she was as responsible as any other employee for recognizing and reporting possible legal and compliance issues, including with respect to the AKS. She even received training to that effect from defendant consistent with its own obligations under the CIA. Indeed,

34

defendant's recovery on the unjust enrichment claim rested in part on plaintiff's breach of her responsibility in that regard.

As for defendant's insistence that plaintiff never actually objected to the proposed study at the relevant time, specifically on the ground that it could be construed as a kickback, even accepting at face value the notion that none of her email communications could be construed to qualify, her conversation with Wu certainly did, and the jury could reach the same conclusion as to her conversation with Lucas. Moreover, as defendant acknowledges, other employees did express concern about the study, even if they ultimately concluded nothing was amiss based on counseling that they misunderstood an "unfortunately worded" email. Regarding defendant's remaining arguments on these issues, defendant presented a considerable case on all these points at trial, but the jury was simply not bound to take that case at face value. See ibid. Therefore, as the judge's findings of fact are supported by the record, his legal conclusions are correct and defendant was not entitled to judgment as a matter of law on plaintiff's CEPA claim at any stage of the proceeding, and its arguments to the contrary present no grounds for reversal.

A-5652-18

B.

Defendant next contends that the judge made two prejudicial errors in his instructions to the jury: instructing the jury that plaintiff's complaints regarding an internal approval process for the proposed study constituted whistleblowing and instructing that that the investigation alone was a retaliatory adverse action.

A "jury is entitled to an explanation of the applicable legal principles" in the case and of how those principles "are to be applied in light of the parties' contentions and the evidence" in the record. Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002) (quoting Rendine v. Pantzer, 276 N.J. Super. 398, 431 (App. Div. 1994)). To that end, in its jury charge, a court must "correctly state the applicable law, outline the jury's function and be clear in how the jury should apply the legal principles charged to the facts of the case at hand." Ibid. It must do so, moreover, in "clear[ly] understandable language[,]" Toto v. Ensuar, 196 N.J. 134, 144 (2008), and in a manner "tailored to the specific facts of the case." Est. of Kotsovska, ex rel. Kotsovska v. Liebman, 221 N.J. 568, 592 (2015).

Clear and accurate jury instructions are essential to a fair trial. Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000). Consequently, where a timely objection was made, as is the case here, an inaccurate instruction will warrant reversal "unless the error is harmless." Toto, 196 N.J. at 144. In that

connection, an error is harmful if, considered in the context of the charge a whole, it was "clearly capable of producing an unjust result." Kotsovska, 221 N.J. at 592 (quoting R. 2:10-2).

Defendant relies for its argument primarily on Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 559-60 (2013), in which the Court explained the need for precise jury instructions responsive to the evidence in a CEPA case, given the demands of the statute:

> [I]t is critical to identify the evidence that an aggrieved employee believes will support the CEPA recovery with care and precision. Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA.
>
> More to the point, trial courts must be precise in their communications with the jury and must ensure that the factual evidence could support a basis for a CEPA claim. When instructing juries, trial courts must be vigilant in identifying the essential complaint made by the employee in order that the jury will be able to test it against the standards that the law imposes as a prerequisite to recovery.

In particular, "it is incumbent upon the court to identify the protected activity precisely, that is, to articulate the complaint that plaintiff made that constitutes whistle-blowing[,]" rather than a "broad and open-ended description[.]" Id. at 561. The model charges, which the court followed here,

echo those guidelines. Model Jury Charges (Civil), 2.32, "New Jersey Conscientious Employee Protection Act ('CEPA') (N.J.S.A. 34:19-1 et seq.)" (rev. Apr. 2014).

I.

With these guiding principles in mind, we discern no error in the judge's instructions regarding the internal approval process. The judge explicitly informed the jury that "[p]laintiff need not prove that the proposed . . . study and its approval process actually violated the law or a clear mandate of public policy[,]" but only that she "actually held the objectively reasonable belief that [defendant] executed or was about to execute the proposed . . . study and that such execution and or that such approval process actually violated the anti-kickback law or were unlawful or [was] in violation of public policy." The judge explained the AKS and read the sections of the CIA requiring that defendant implement policies and procedures meant to ensure its compliance with federal law, including the AKS.

Moreover, the judge cautioned that CEPA was "not intended to provide a remedy for employees who simply disagree with an employer's decision where that decision is lawfully made" and that the jury's focus should consequently "not be on the efficiency or sufficiency of [defendants'] internal research

38

proposal review" but, with reference to the AKS, on whether defendant "knowingly and willfully offer[ed] to pay or do something to induce another person or company to purchase or recommend [its] drug or product." The judge reiterated, plaintiff had to "establish that she reasonably believed that [defendant] was executing or about to execute the . . . study as a kickback disguised as research in violation of the anti-kickback law or by reference to [the] corporate integrity agreement which incorporates it." We conclude these instructions accurately conveyed to the jury the relevant facts and the governing law, and we discern no error.

## II.

We also reject defendant's assertion that instructions led the jury to believe the investigation standing alone qualified as an adverse employment action. Defendant states that under the statute, the "definition of retaliatory action speaks in terms of completed action[,]" such as "[d]ischarge, suspension or demotion[,]" and, for that reason, "action taken to effectuate the 'discharge, suspension or demotion'" does not qualify. Keelan v. Bell Commc'ns Rsch., 289 N.J. Super. 531, 539 (App. Div. 1996). An investigation into misconduct "normally" falls outside the definition. Beasley v. Passaic Cnty., 377 N.J. Super. 585, 606 (App. Div. 2005).

39

In this case, however, the judge explicitly and correctly instructed the jury that to prevail in her case, plaintiff needed to show a connection specifically between the whistleblowing and the termination, with no mention of the investigation.  Although the judge described the investigation again as an alleged retaliatory action, he repeatedly tasked the jury with evaluating the existence of a causal connection only between the whistleblowing and the termination.

The jury verdict sheet echoed those instructions, asking whether plaintiff "establish[ed] by a preponderance of the evidence that there [wa]s a causal connection between the 'whistle blowing' activity and plaintiff's termination of employment at Novartis[,]" again with no mention of the investigation. Considered in this full context, we discern no error, nor did the instructions have the clear capacity to produce an unjust result warranting reversal. Kotsovska, 221 N.J. at 592.

## C.

On her cross-appeal, plaintiff first argues that the judge erred in denying her judgment as a matter of law on defendant's unjust enrichment claim.  Using the same standard as the trial court, we find no error in the judge's decision.

A-5652-18

To prevail on a claim for unjust enrichment, a party must demonstrate that the opposing party "received a benefit" from him or her and that "retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994). Most commonly, such a claim arises in the situation where a party "has not been paid despite having had a reasonable expectation of payment for services performed or a benefit conferred." Cnty. of Essex v. First Union Nat'l Bank, 373 N.J. Super. 543, 550 (App. Div. 2004). This sort of "quasi-contractual recovery is known as quantum meruit ('as much as he [or she] deserves')[] and entitles the performing party to recoup the reasonable value of services rendered." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437-38 (1992). The obligation is "wholly unlike an express or implied-in-fact contract in that it is 'imposed by the law for the purpose of bringing about justice without reference to the intention of the parties.'" Saint Barnabas Med. Ctr. v. Cnty. of Essex, 111 N.J. 67, 79 (1988) (quoting Saint Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am., 32 N.J. 17, 22 (1960)).

However, "[i]t is only when the parties do not agree that the law interposes" such an obligation. Moser v. Milner Hotels, 6 N.J. 278, 280 (1951). Consequently, "the existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit." Kas Oriental

41

Rugs, Inc. v. Ellman, 394 N.J. Super. 278, 286 (App. Div. 2007). A party may still plead breach of contract and quantum meruit in the alternative and, where sufficient evidence exists for each, have both claims submitted to the jury. Caputo v. Nice-Pak Prods., Inc., 300 N.J. Super. 498, 504 (App. Div. 1997). But once the jury concludes that an express contract exists, recovery may not be had under the alternative theory. N.Y.-Conn. Dev. Corp. v. Blinds-To-Go (U.S.) Inc., 449 N.J. Super. 542, 557 (App. Div. 2017).

The agreements at issue here undisputedly existed, were viable, governed a participating employee's entitlement to incentive benefits under each plan, detailed the employee's responsibility to adhere to company policies to maintain that entitlement, and explained the appropriate mechanism for identifying any violation and recovering benefits already paid on account of such violation. Specifically, the AIP agreement provided:

> The payment of any award under this [p]lan is subject to the participant's adherence to and compliance with all applicable laws, as well as all internal rules of Novartis such as the [c]ode of [c]onduct, the Novartis Pharmaceuticals [c]orporation [c]onflicts of [i]nterest [p]olicy, the [g]uideline on reporting violations of law and policies, and the other Novartis policies, procedures, and guidelines applicable to a participant's work . . . . These [g]uidelines, which may be amended from time to time through publication on the Novartis intranet or otherwise, form an integrated part of this incentive plan.

42

In the event of an employee's noncompliance, the agreement explicitly set forth the following avenue for recovery of any incentives already paid to the employee:

> [I]n case the administrator of the [c]ompany's [p]lan, in its sole discretion, determines that the participant has violated the law, the [c]ode of [c]onduct, or any provision of the [g]uidelines in a substantial or material way (including, but not limited to, fraud, bribes, scientific misconduct, illegal marketing practices such as off-label promotion, offering kickbacks, etc.), AIP awards will be withheld and the participant shall agree promptly to repay any incentive already received for any period in which such violation(s) occurred or were discovered. In the event of the participant's failure to disgorge such amounts illegitimately received by him or her under the above provision, the participant agrees that the [c]ompany may sue him or her for recovery of such proceeds on the basis of breach of contract . . . .

The SIP likewise required a participant's adherence to the same company policies, including the code of conduct, under the same terms. But it left determination of whether the participant violated any of those policies, justifying a clawing back of paid incentives, whether voluntarily or through legal action, to a committee charged with administering the plan.

The agreements thus governed the same basic subject as that at issue in defendant's unjust enrichment claim. But, as the judge aptly noted, defendant's code of conduct, which plaintiff routinely certified a commitment to follow,

imposed an independent equitable obligation to return any incentives earned while in violation of the law or company policy, without any reference to the AIP or SIP agreements or the mechanisms for recovery. The code of conduct set forth:

> [E]mployment with the [c]ompany and the [c]ompany's payment of any incentive and/or bonus compensation are conditioned on compliance with applicable laws and associated company policies.

> Any associate found by the [c]ompany to be in violation of the law or any material provision of any [c]ompany [p]olicy (including fraud, pattern of off-label promotion, pattern of offering kickbacks, antitrust, bribery, scientific misconduct, etc.) will not earn or receive any incentive bonus compensation for any period in which such violations occurred or were discovered. Associates will be required to repay to the [c]ompany any such incentive or bonus compensation already paid during a period in which the associate violates the law or any material provision of any [c]ompany [p]olicy or the period in which such violation was discovered.

> In addition to any other remedy that the [c]ompany may have to recover damages, if an associate fails to repay any such incentive or bonus compensation already paid to him or her, the [c]ompany may institute a lawsuit to recover the amount of incentive or bonus compensation plus costs and fees incurred in pursuing the lawsuit.

Caselaw does not bar imposition of this equitable obligation because it does not conflict with plaintiff's obligation under the express contract. See

44

Blinds-To-Go, 449 N.J. Super. at 557 (explaining that the law forbids recovery only on "inconsistent theories"). It simply affords an independent avenue of recovery. Moreover, plaintiff does not quarrel with the judge's reasoning or the viability of the unjust enrichment claim in any other respect. Thus, the judge did not err in declining to grant plaintiff judgment as a matter of law on defendant's counterclaim for unjust enrichment.

D.

Both parties next take issue with plaintiff's attorney fee award. Defendant asserts that the award was excessive, while plaintiff argues that the judge abused his discretion in reducing the base award in various respects, in limiting the enhancement of that award, and in declining to grant a supplemental fee application. We reject the parties' arguments and find the award of attorney's fees were well within the judge's discretion.

Our courts generally adhere to the American Rule, which holds each party responsible for its own attorney fees. Rendine, 141 N.J. at 322. But the CEPA statute expressly authorizes recovery of reasonable attorney fees and costs to a "prevailing employee," N.J.S.A. 34:19-5(e), and a court may grant such relief to the extent of that party's "overall success" in the litigation. DePalma v. Bldg. Inspection Underwriters, 350 N.J. Super. 195, 219 (App. Div. 2002).

In setting an award, a trial court must first determine an appropriate lodestar, "'the most significant element in the award of a reasonable fee[,]'" which is "derived by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate[.]" Walker v. Giuffre, 209 N.J. 124, 130 (2012) (quoting Rendine, 141 N.J. at 335). For that purpose, pursuant to Rule 4:42-9(b), counsel for the prevailing party must submit a certification of services sufficiently detailed to enable accurate calculation. Id. at 131. That is, with "fairly definite information as to the hours devoted to various general activities . . . and the hours spent by various classes of attorneys." Ibid. (quoting Rendine, 141 N.J. at 337). Yet courts must not accept such submissions at face value and instead must undertake a "careful[] and critical[]" evaluation of the hours and rates entailed. Rendine, 141 N.J. at 335.

In undertaking its task, the court must ensure the lodestar reflects only the time counsel reasonably expended, rather than actually expended, in prosecuting the case. Ibid. Consequently, the court may exclude any hours "for which counsel's documentary support is marginal[,]" Szczepanski v. Newcomb Med. Ctr., 141 N.J. 346, 368 (1995), or otherwise reduce that element of the calculation to the extent "the hours expended, taking into account the damages prospectively recoverable, the interests to be vindicated, and the underlying

statutory objectives, exceed those that competent counsel reasonably would have expended" in the same litigation.  Rendine, 141 N.J. at 336.  Moreover, the court must ensure the hourly rate awarded is "fair, realistic, and accurate" and must calculate it "'according to the prevailing market rates in the relevant community'" for "'similar services'" offered by attorneys of comparable "'experience and skill'" to the prevailing party's counsel.  Id. at 337 (quoting Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990)).

Once the court establishes an appropriate lodestar based on those elements, it may enhance the fee award to adequately compensate the attorney for his or her assumption of the "actual risk that the attorney will not receive payment if the suit does not succeed."  Id. at 338.  To ensure an appropriate "relationship between the amount of the enhancement awarded and the extent of th[at] risk[,]" the court should set the enhancement on consideration of "'whether [the] case was taken on a contingent basis, whether the attorney was able to mitigate the risk of nonpayment in any way, and whether other economic risks were aggravated by the contingency of payment[.]'"  Id. at 339 (quoting Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 483 U.S. 711, 747 (1987) (Blackmun, J., dissenting)).

47

Ultimately, a trial court's decision as to an attorney fee award rests within its broad discretion. Desai v. Bd. of Adjustment of Phillipsburg, 360 N.J. Super. 586, 598 (App. Div. 2003). Such an award "will be disturbed only on the rarest of occasions, and then only because of a clear abuse of [that] discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine, 141 N.J. at 317).

## I.

First, defendant takes issue with the judge's fee decision only insofar as it believes the award effectively reimburses plaintiff for fees attributable to her unsuccessful defense on defendant's counterclaim for unjust enrichment at an enhanced rate. While there is certainly authorization for reduction of an award to reflect a claimant's limited success, in particular by excluding excess hours expended on unsuccessful aspects of the litigation, see Rendine, 141 N.J. at 336, where a "a plaintiff's unsuccessful claims are related to the successful claims, either by a 'common core of facts' or 'related legal theories,' the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated." Singer v. State, 95 N.J. 487, 500 (1984) (quoting Hensley v. Eckerhart, 461 U.S. 424, 435 (1983)). So long as the "results obtained are fully effective in vindicating

plaintiff's rights, counsel should recover for all hours reasonably expended on the litigation." Ibid.

The judge aptly concluded that was the case here, noting that the "counterclaim was so interwoven with [p]laintiff's case that regardless of whether it was a counterclaim or merely an affirmative defense, [p]laintiff was required to respond to arguments that she violated company policy[,]" leaving no excess expenditure of time on that account that would warrant exclusion. Indeed, the alleged misconduct underlying defendant's counterclaim was identical to that which defendant had advanced as its true, appropriate reason for plaintiff's termination in defense to the CEPA claim. Notably, however, the judge did consider defendant's success on the counterclaim in limiting the enhancement and so reduced the award in that manner. The judge's determination not to also reduce the lodestar on the same ground, in light of the interwoven nature of the claims, was not an abuse of discretion. Ibid.

II.

On her cross-appeal, plaintiff argues that the judge abused his discretion in calculating a reduced lodestar for Webber McGill's services, asserting that the judge imposed an inappropriate ceiling on rates for the firm's attorneys and that the judge settled on a reasonable rate that was contrary to counsel's submissions.

Moreover, she contends the judge inappropriately imposed rate reductions for attorneys he mistakenly believed did not actively participate at trial or in motion practice and arbitrarily excluded considerable amounts of time without identifying precisely which entries it had reduced.

In determining fees, the judge merely considered the terms of the agreement as a factor in determining a reasonable rate, consistent with the Supreme Court's guidance to that effect in the same authority. Szczepanski, 141 N.J. at 357. And, in light of his conclusion that the rate indicated in the agreement would be a reasonable one for the firm's lead attorney, that rate would thereby effectively serve as a "ceiling" for the rates assigned to other less experienced attorneys in the same firm.

Moreover, plaintiff's contention that the judge was bound to set rates consistent with counsel's submissions, in the absence of any contrary showing on defendant's part, runs directly contrary to the judge's responsibility not to merely accept those submissions at face value, but to engage in a "careful[] and critical[]" evaluation of the issue. Rendine, 141 N.J. at 335. The judge's diligent undertaking of that task is clear from the opinion, wherein he arrived at a set of reasonable rates for the firm's attorneys on consideration of several factors,

among them the retainer agreement and each attorney's relative level of education, experience, and role in the litigation.

Nor is there any merit to the balance of plaintiff's contentions with regard to the lodestar for Webber McGill's services. Plaintiff asserts the judge's perception of certain attorney's relative roles in the litigation was mistaken yet cites no evidence in the record contradicting the judge's findings based on his review of counsel's submissions and his own observation of the proceedings. Moreover, the judge's exhaustive identification of the billed hours he found excessive on various grounds, such as redundancy and failure of proof, based on his careful review of counsel's submissions, were accompanied by explanations of those grounds that were adequate to ensure the reductions were within the judge's discretion.

Plaintiff next argues the judge should have accepted counsel's submissions relevant to Murray's reasonable hourly rate, rather than the rate reflected in a fee award from unrelated litigation and asserts that the judge arbitrarily excluded reasonable hours Murray had expended on the case for various meetings, conferences, and other communication among the attorneys. Plaintiff ignores, however, that the judge reduced Murray's hours in that respect not on a conclusion that such meetings were unnecessary in themselves but because the

51

billing records failed to include any detail establishing the need for "multiple attorney attendance." The judge was well within his discretion to discount expenditures of time for which counsel failed to provide adequate information to ensure their reasonableness. See Szczepanski, 141 N.J. at 368. And, with regard to Murray's hourly rate, the judge was not bound to simply accept counsel's submissions at face value but could conclude that the rate reflected in a recent award to the same attorney in the same sort of litigation could constitute a reasonable one, on consideration of the balance of the relevant circumstances. Rendine, 141 N.J. at 335.

Plaintiff also argues that the judge abused his discretion by relying on inappropriate factors to limit counsel's fee enhancement—specifically her lack of success in defending against the unjust enrichment claim, her abandonment of an emotional distress claim, and her decision against calling two experts during trial. The judge, however, was within his discretion to consider the unfavorable verdict on the counterclaim in evaluating the extent to which plaintiff prevailed in this litigation and to ensure the reasonableness of the fee award relative to her overall level of success. See DePalma, 350 N.J. Super. at 219. Moreover, the judge never considered, in the balance, plaintiff's abandonment of the counterclaim or decision not to call the expert witnesses on

the notion that those actions inherently weighed in favor of reduction of an enhancement, as plaintiff suggests. Instead, consistent with his discretion in setting a reasonable award, he considered only that the late timing of those decisions in this litigation ultimately brought about an excess expenditure of fees that would have been unfair for the ultimate award to reflect. Packard-Bamberger, 167 N.J. at 444.

Lastly, plaintiff argues that the judge erred, on the limited remand, in declining to grant her motion for a supplemental award of past fees, which she failed to raise until after the matter had already been appealed. The judge denied her motion for that relief without prejudice on the ground that it exceeded the scope of the remand and that the judge therefore was without jurisdiction to consider it at that point.

The judge was correct in his findings. The matter was already on appeal, and authorization for the remand was confined to entertainment of the parties' motions for reconsideration of the judge's August 27, 2019 order. See In re Plainfield-Union Water Co., 14 N.J. 296, 302 (1954) (noting that filing of notice of appeal "divests the lower court of jurisdiction save as reserved by statute or rule" and that such jurisdiction is restored only pursuant to mandate by this court). Plaintiff does not dispute that, but merely urges this court to remand the

matter for consideration of the supplemental award anyway. Even aside from the lack of any error justifying that outcome, plaintiff's prior motion was denied without prejudice, already leaving her free to renew it once this appeal concludes, as the trial judge aptly noted. Thus, we discern no abuse of discretion in the judge's fee awards.

E.

Finally, plaintiff argues that the judge erred in the punitive damages phase of the trial, specifically by denying a requested jury instruction that would have placed at issue the conduct of three additional management-level employees and excluding as evidence an unredacted version of defendant's CIA. We reject plaintiff's argument.

The CEPA statute explicitly authorizes recovery of punitive damages, where appropriate. N.J.S.A. 34:19-5. Generally, such damages—sanctions awarded separately from compensatory damages to punish or deter "particularly egregious conduct"—are meant to be a "limited remedy" and "must be reserved for special circumstances." Maudsley v. State, 357 N.J. Super. 560, 590-91 (App. Div. 2003). Accordingly, our Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, permits recovery of such sanctions only on proof, "by clear and convincing evidence, that the harm suffered was the result of the [adverse

party]'s acts or omissions, and [that] such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by [them]." N.J.S.A. 2A:15-5.12(a). In setting an appropriate award, a factfinder should consider "all relevant circumstances," Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 338 (1993), including the nature, duration, and severity of the offending conduct and the defendant's awareness of the risk of serious harm arising from that conduct. N.J.S.A. 2A:15-5.12(b) to (c).

In CEPA claims in particular, "punitive damages are available against an employer only if there is 'actual participation by upper management or willful indifference.'" Longo v. Pleasure Prods., Inc., 215 N.J. 48, 58 (2013) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 419 (1994)). Discerning whether individuals qualify as "upper management" is a fact-sensitive undertaking but will ultimately depend not on their formal titles, but on whether they have "'significant power, discretion and influence within their own departments,' capable of furthering the mission of the organization and of selecting courses of action from available alternatives." Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 122-23 (1999) (quoting N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 356 (1997)). In general, upper management should

consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers). For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace.

[Id. at 128-29.]

Guided by these principles, the judge's determination to include Goldman, Shaw, and Lazala as upper management employees and to exclude Lucas, Nau, and McGee was not error because his findings are adequately supported by the record. McGee arguably had no less claim to qualify as upper management than Lazala, whom she succeeded in the legal department and whom the judge did include. Moreover, to the extent of any reasonable dispute, whether McGee or the others qualified should have been a question for the jury. See Cavuoti, 161 N.J. at 122 (noting that issue is fact-sensitive). Plaintiff cites no clear and convincing evidence of "actual malice" or "wanton and willful disregard" on any of their parts, N.J.S.A. 2A:15-5.12(a), that would have rendered the judge's

decision on this jury instruction anything other than harmless, even if it were error. Toto, 196 N.J. at 144.

The judge also reasoned that punitive damages were available in a CEPA lawsuit specifically to punish and deter the retaliatory conduct at issue in that statute and that the CIAs, which documented transgressions of unrelated statutes, were irrelevant on that point. A trial judge's determination as to the relevance and consequent admissibility of evidence rests within its broad discretion and will not be disturbed on appeal absent its palpable abuse of that discretion. Verdicchio v. Ricca, 179 N.J. 1, 34 (2004). Here, nothing in the CEPA statute suggests its authorization for punitive damages is any broader than logic would dictate—as punishment for conduct specifically violating that statute, N.J.S.A. 34:19-5—and the PDA enumerates for consideration in setting an award characteristics exclusively of the conduct that caused the plaintiff harm, not any broader wrongdoing. N.J.S.A. 2A:15-5.12(b) to (c). In light of that standard, we discern no abuse of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5652-18